J-S96015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: N.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.B. | No. 1115 WDA 2016 |

Appeal from the Order Entered June 30, 2016
In the Court of Common Pleas of Blair County
Civil Division at No(s): CP-07-DP-120-2015/FID #07-FN-00065-2015

BEFORE: BENDER, P.J.E., BOWES, J., and SOLANO, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED FEBRUARY 9, 2017**

J.B. (Mother) appeals from the order entered on June 30, 2016, in the context of a dependency proceeding that resulted in the finding that N.C. (Child), born in August of 2015, was the victim of child abuse perpetrated by J.C. (Father)[1] and by omission as to Mother. The order declined to find aggravating circumstances. After review, we affirm.

This appeal centers on a petition requesting a finding of child abuse and a motion for aggravated circumstances filed by Blair County Children Youth & Families (BCCYF) against both Mother and Father. In Mother's brief, she raises the following issues for our review:

> I. Did the [c]ourt commit error in concluding that [M]other J.B. committed child abuse by omission thus justifying a founded report?
>
> II. Is the standard of prima facie evidence to establish abuse unfair to an individual in the shoes of [Mother] given the

---

[1] Father did not appeal from the June 30, 2016 order and is not a party in the instant matter.

consequences of such a finding and the lack of evidence that she had knowledge of such abuse[?]

Mother's brief at 4.

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375. Moreover, we note that:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re L.V.*, 127 A.3d 831, 834 (Pa. Super. 2015) (quoting *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013)).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Timothy M. Sullivan of the Court of Common Pleas of Blair County, dated June 30, 2016. We conclude that Judge Sullivan's thorough, well-reasoned opinion properly disposes of the issues raised by Mother. Thus, we adopt Judge Sullivan's opinion as our own and affirm the order appealed from on that Basis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2017

- 2 -

# IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN THE INTEREST OF
N.C., a minor

         :    CP-07-DP-120-2015

         :    FID#07-FN-00065-2015

. . . . . . . . . .

| | |
|---|---|
| HON. TIMOTHY M. SULLIVAN | PRESIDING JUDGE |
| JUSTIN WITT, ESQUIRE | COUNSEL FOR BCCYF |
| TRACI L. NAUGLE, ESQUIRE | COUNSEL FOR MOTHER |
| ASHLAN CLARK, ESQUIRE | COUNSEL FOR FATHER |
| TYLER A. ROWLES, ESQUIRE | GUARDIAN AD LITEM |

## *OPINION AND ORDER*

Now before the Court is Blair County Children Youth & Families' ("BCCYF" or "Agency") Petition for Finding of Child Abuse and Motion for Aggravated Circumstances regarding N.C. (D.O.B. 8/●/15)[1]. For the reasons explored herein, this Court finds that N.C. suffered abuse under the custody of his parents, J.C. and J.B. This Court also finds that J.B. and J.C. perpetrated the abuse. However, we find that the abuse does not support a finding of aggravated circumstances.

---

[1] This dependency case is also connected with a matter involving J.B.'s daughter, L.B. For the purposes of this opinion, however, we will not address issues involving L.B.

1

## PROCEDURAL/FACTUAL HISTORY [2]

The allegations of abuse inflicted upon N.C. begin with a doctor's visit on September 30, 2015. On that day, J.B. took N.C. to Nason Hospital for a sick visit with Joseph Castel, M.D. [Feb 12 N.T., p. 20 l. 13-21]. Dr. Castel is a general pediatrician at Nason who has practiced for twenty-three (23) to twenty-four (24) years. [Feb 12 N.T., p. 19]. At the February 12 hearing, this Court qualified Dr. Castel as an expert in pediatric medicine.

N.C. presented to Dr. Castel at Nason Hospital with a number of injuries that Dr. Castel believed to be consistent with child abuse.[3] [N.T. Feb 12, p. 40]. Specifically, Dr. Castel found rib fractures, both recent and in various states of healing and an injury to N.C.'s upper lip frenulum. Based upon this presentation, Dr. Castel reported the injuries to BCCYF and scheduled a child abuse consult ("CAC") with Children's Hospital of Pittsburgh. [N.T. Feb 12, p. 38]. A later follow up appointment with Dr. Castel on February 7, 2016, while the Agency had custody of N.C., revealed no further injuries or developmental delays. [N.T. Feb 12, p. 40].

On October 1, 2015, N.C. presented at the Children's Hospital of Pittsburgh emergency department. [N.T. Feb 12, p. 56]. Dr. Jennifer Clarke, a pediatrician specializing in child abuse, examined N.C. [N.T. Feb 12, p. 57]. J.C. and J.B. provided Dr. Clarke with N.C.'s medical history, explaining that N.C. recently had a respiratory infection. [N.T. Feb 12, p. 72]. Dr. Clarke then performed a full examination of N.C., finding rib fractures in various states of healing, an upper lip frenulum injury, "bucket-handle" fractures of the legs, and a Grade 2 liver laceration. [N.T. Feb 12, p. 58-65].

---

[2] The amount of testimony received in this case is voluminous—we therefore set forth only a brief factual history here. Extended discussions of the testimony are provided in the Discussion, *infra.*

[3] The discovery of these injuries as well as their severity is detailed in our Discussion, *infra.*

When asked about these injuries, J.C. provided a number of explanations. [N.T. Feb 12, p. 71-81]. According to Dr. Clarke, J.B. appeared puzzled by some of these explanations, but supported some of J.C.'s contentions. Id. It is Dr. Clarke's professional opinion that N.C. suffered child abuse and none of the explanations provided by J.C. and J.B. account for N.C.'s injuries. [N.T. Feb 12, p. 79-81, 85]. Dr. Clarke believes that, in the totality of the circumstances, a reasonable person would have known that N.C. was hurt at the time any one of N.C.'s injuries occurred. [N.T. Feb 12, p. 85]. A follow up examination on October 13, 2015, after the Agency took custody of N.C., showed no new injuries. [N.T. Feb 12, p. 86-87].

The Agency commenced the instant matter by filing an Application for Emergency Protective Custody on October 1, 2015. The Court granted this Application on the same day, issuing an Order which placed both legal and physical custody of N.C. with the Agency. The Agency subsequently filed a Dependency Petition on October 2, 2015, and the Court appointed Tyler A. Rowles, Esquire to represent N.C.'s interests and Traci L. Naugle, Esquire to represent J.B. On December 18, 2015, the Agency filed a Motion for Aggravated Circumstances alleging that they received an indicated report of child abuse naming J.C. as the perpetrator and J.B. as a perpetrator through aggravated physical neglect.

The Court placed N.C. in shelter care on October 15, 2015 and declared him dependent on October 30, 2015. Both children currently remain in foster care, under the legal and physical custody of the Agency. J.B.'s parents, T.B. and P.B., filed Petitions to Intervene on January 21, 2016. The Agency answered these Petitions on February 7, 2016, recommending that the Court deny them for lack of standing pursuant to the Juvenile Act. The Court denied that Petition by Order of Court on March 14, 2016. We

3

also directed the paternal grandparents, J.C and T.C., to take all necessary remaining steps to be approved as Kinship Foster Parents.

Relative to the pending Petitions and Motions, this Court held Permanency/Dispositional review on February 12 and March 7, 2016. At these hearings, this Court received testimony from Dr. Castel, Dr. Clarke, caseworkers from the Agency, and J.B. We then directed the parties to file memoranda of law relative to the Petition for Finding of Child Abuse by March 31, 2016. Having received memoranda from the Agency, Mother, and the Guardian-Ad-Litem, we are prepared to dispose of the child abuse allegations pertaining to N.C.

We now proceed to disposition.

## *APPLICABLE LAW*

Under Pennsylvania law, findings of child abuse are regulated by the Child Protective Services Law ("CPSL"). **23 Pa. C.S.A. § 6301 et seq.** The CPSL puts forth the definition of child abuse in this Commonwealth:

> **(b.1) Child abuse.**--The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> (1) Causing bodily injury to a child through any recent act or failure to act.
>
> &ast; &ast; &ast; &ast; &ast;
>
> (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.
>
> &ast; &ast; &ast; &ast; &ast;
>
> **23 Pa. C.S.A. § 6303(b.1) (in part).**

4

"Bodily injury," as used in the CPSL, means "impairment of physical condition or substantial pain." 23 Pa. C.S.A. § 6303. This definition is considerably broader than the old requirement of "serious bodily injury," which was defined as "an injury that: (1) causes a child severe pain; or (2) significantly impairs a child's physical functioning, either temporarily or permanently." *In re L.Z.*, 111 A.3d 1164, 1168 n. 3 (Pa. 2015).

For this Court to sustain a finding of child abuse, the Agency must present clear and convincing evidence that (1) the alleged abuse occurred and (2) the person accused perpetrated the abuse. 42 Pa. C.S.A. § 6341(c); *L.Z.*, 111 A.3d at 1176. However, a parent or other person responsible for the welfare of the child may be found to have perpetrated the child abuse based upon *prima facie* evidence:

> (d) Prima facie evidence of abuse.--Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa. C.S.A. § 6381(d).

The presumption under Section 6381(d) is rebuttable and allows those accused parents or other persons responsible for the welfare of the child to present evidence that they did not commit the abuse or they were not responsible for the welfare of the child. *L.Z.*, 111 A.3d at 1185.

Under the Juvenile Act, Pennsylvania courts may find that aggravated circumstances in dependency such that the subject child should be removed from the custody of the parent or custodian:

5

(e) Permanency hearings—

\*     \*     \*     \*     \*

(2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing . . .

42 Pa. C.S.A. § 6351(e)(2).

Our Legislature specifically provides that child abuse may rise to that level:

"Aggravated circumstances." Any of the following circumstances:

\*     \*     \*     \*     \*

(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

\*     \*     \*     \*     \*

"Aggravated physical neglect." Any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning.

\*     \*     \*     \*     \*

"Serious bodily injury." Bodily injury which creates a substantial risk of death of which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.

42 Pa. C.S.A. § 6303.

6

## DISCUSSION

We must now determine the merits of the Agency's Petition for Finding of Child Abuse and Motion for Aggravated Circumstances. This Court shall address each issue separately.

### I. CHILD ABUSE FINDINGS

Before the Court are three interlocked questions: (1) whether N.C. suffered child abuse; (2) if N.C. suffered abuse, whether J.C. perpetrated the abuse; and (3) if N.C. suffered abuse, whether J.B. perpetrated the abuse by omission. We shall address each of these questions in turn.

#### A.     The Alleged Abuse of N.C.

Based upon the presentations of Dr. Castel and Dr. Clarke, this Court finds that, by clear and convincing evidence, N.C. suffered child abuse. We shall address each of the injuries N.C. suffered in turn.

##### 1.     The Rib Fractures

During the September 30th visit, Dr. Castel noted a "visible deformity" on N.C.'s rib cage that was immediately identifiable. [Feb 12 N.T., p. 26-28]. Dr. Castel palpated these deformities, feeling for any crackles or crepitations in the rib cage. [Feb 12 N.T., p. 45-46]. Based upon that examination, Dr. Castel ordered X-ray radiographs of N.C.'s chest, which showed multiple areas of callous formation indicating healing fractures. [Feb 12 N.T., p. 32]. In Dr. Castel's opinion, these fractures would only be possible from child abuse or a major unrestrained motor vehicle accident. [N.T. Feb 12, p. 36, 40].

Dr. Castel testified that the fractures would have caused N.C. a great deal of both pain and distress, which would have presented with fussiness and crying. [N.T. Feb 12, 37-38, 40]. He also testified that the callouses became so thick that they lifted N.C.'s

7

skin. [N.T. Feb 12, p. 35]. Dr. Castel testified that he had previously only seen such fractures after performing cardiac pulmonary resuscitation on infants. [N.T. Feb 12, p. 34-35].

Dr. Clarke also found multiple rib fractures on N.C. in various states of healing, some having calloused into hard lumps and others presenting without callouses. [N.T. Feb 12, p. 62-63]. Dr. Clarke specifically testified that the forces necessary to create these types of fractures are "well out of the realm of reasonable in caring for an infant" and could not have occurred through normal handling. [N.T. Feb 12, p. 79-81]. She also testified that these injuries would have caused the child substantial pain and N.C. would have manifested the pain in such a manner as to let any reasonable person know that he was significantly injured. [N.T. Feb 12, p. 84-85]. We note that Dr. Clarke could not put a timeframe on how long N.C. might have manifested this pain. Id. However, Dr. Clarke was able to determine that N.C.'s healing fractures were at least three weeks old and his acute fractures occurred less than a week before the examination. [N.T. Feb 12, p. 63].

X-ray radiographs taken by both Dr. Castel and Dr. Clarke also confirmed the presence of fractures. Dr. Castel and his coordinating radiologist found five total fractures on N.C., noting multiple areas of callous formation around multiple ribs. [N.T. Feb 12, p. 33-34, 62]. Dr. Clarke found three healing fractures on N.C.'s right side, as well as five acute fractures—one on his right side and four on his left side. [N.T. Feb 12, p. 62]. Dr. Castel's radiologist specifically remarked that these injuries were "highly suspicious for non-accidental trauma." [N.T. Feb 12, p. 33].

8

In both Dr. Castel and Dr. Clarke's professional opinions, these fractures were the result of child abuse. [N.T. Feb 12, p. 40, 62-63, 85]. Dr. Clarke specifically stated that these fractures may have occurred by direct trauma or by a squeezing/compression mechanism, all well outside what could be considered normal handling of an infant. [N.T. Feb 12, p. 63-64].

We also note that Dr. Castel and Dr. Clarke discounted all of the explanations provided by J.C. and J.B. When told about the rib fractures, J.C. explained that N.C. fell off a couch onto a hardwood floor recently and also that he heard a pop after pushing on N.C.'s chest to help him clear thick mucosa and formula. [N.T. Feb 12, p. 76-78]. However, both physicians repeatedly stated that the amount of pressure and force required to generate a rib fracture is much greater than either of the incidents could produce. [N.T. Feb 12, p. 34, 62-64]. Dr. Clarke took particular exception to another explanation proffered by J.C., wherein N.C. allegedly fell from J.C.'s arms and J.C. managed to catch N.C. by his chest before N.C. hit the floor. [N.T. Feb 12, p. 63-64, 75]. In this instance, Dr. Clarke found it unusual that J.C. would catch N.C. by his chest and also opined that the amount of force generated by such an incident would be well short of the force necessary to generate rib fractures. Id.

This Court notes the absence of a reasonable explanation regarding N.C.'s severe injuries based upon both the physicians' testimony and J.B.'s testimony. J.B. testified before this Court that she and J.C. were N.C.'s primary caretakers [N.T. Mar 7, p. 131-33]. J.B. cared for N.C. nearly around-the-clock from birth until N.C. was five weeks old—J.B. and J.C. then transitioned into a twelve hour schedule, wherein J.B. would watch N.C. during the day while J.C. worked and J.C. would watch N.C. during the night while J.B. worked. [N.T. Mar 7, p. 128-33]. The only other persons who were around

9

during the first five weeks of N.C.'s life were J.B.'s parents, one of whom testified that he was not involved in N.C.'s care and J.C. and J.B. performed almost all of N.C.'s care. [N.T. Mar 7, p. 148-52].

Based upon all the circumstances and evidence presented before this Court, we find that clear and convincing evidence that N.C.'s rib fractures constitute child abuse under the CPSL. Both physicians testified that these injuries constitute child abuse and neither parent could explain how the child suffered these injuries by any other means. We also note that these injuries placed N.C. in substantial pain and represent a systematic failure to care for N.C. Therefore, based upon the evidence presented, we find that N.C.'s rib injuries constitute child abuse under the CPSL.

2.     Frenulum Injury

Both physicians also found an injury to N.C.'s mouth. Specifically, Dr. Castel discovered that the frenulum between N.C.'s top two teeth showed signs of trauma. [N.T. Feb 12, p. 27]. In his medical opinion, the injury was an old hematoma, approximately one quarter inch in length. [N.T. Feb 12, p. 28-29]. Dr. Castel believed that N.C. suffered the injury approximately one week earlier. Id. The injury was concerning to Dr. Castel—considering the child's age and development, a hematoma of this nature is most likely inflicted by blunt force and the amount of blood the injury generates should alert caretakers that the child requires immediate attention. [N.T. Feb 12, p. 29-30]. Dr. Castel also testified that the child could not have inflicted the injury upon himself. [N.T. Feb 12, p. 31]. Such an injury, in Dr. Castel's opinion, would cause substantial pain for at least a few days and present acutely when feeding the child a bottle. [N.T. Feb 12, p. 38]. Dr. Castel firmly believes that this injury is the result of child abuse. [N.T. Feb 12, p. 40].

10

Dr. Clarke also found the frenulum injury, along with bruising on N.C.'s right cheek and lip. [N.T. Feb 12, p. 58]. In her medical opinion, the injury would have been noticeable by the blood loss alone. [N.T. Feb 12, p. 59]. While Dr. Clarke did not describe the injury in detail, she did indicate that the child could not have cut his own frenulum and the injury could have been inflicted by grabbing the child's face and shoving a hard object (e.g. a bottle) into his mouth. Id. Dr. Clarke unequivocally believes that this injury is the result of child abuse. [N.T. Feb 12, p. 85].

J.C. attempted to explain the nature of this injury to Dr. Clarke, stating that N.C. enjoys his pacifier and also hits himself in the face and mouth. [N.T. Feb 12, p. 80]. According to J.C., he turned away from N.C. during one of these episodes and reemerged to find N.C. with a finger in his mouth. Id. When J.C. removed the finger, he noticed some blood and held a napkin under N.C.'s mouth until the bleeding stopped. Id. Dr. Clarke discarded this explanation as not credible. [N.T. Feb 12, p. 81].

J.B. presented a different explanation of this injury. According to her, J.C. called and stated that he saw a little bit of blood in N.C.'s mouth after removing a bottle. [N.T. Mar. 7, p. 134]. J.B. then asked whether N.C.'s mouth was overly bleeding and J.C. responded that it was only a "little bit and that he had got a cold bottle and had put it in his mouth to kind of like help it." Id. J.B. then told J.C. she would be home as soon as possible and arrived home to find no swelling, bruising, or bleeding. Id.

This Court finds that the frenulum injury was the result of child abuse. We once again find the testimony of Dr. Castel and Dr. Clarke credible in all respects and believe that this injury could not have been self-inflicted. The explanations provided by both J.B. and J.C. are entirely inconsistent and fail to explain how N.C. could have received an

11

injury mostly likely caused by blunt force trauma. While it is possible that removing the bottle from N.C.'s mouth may have caused an injury, both physicians testified that the amount of blood generated by such a hematoma would alert any caretaker that the child required medical attention. Dr. Castel also remarked that the child would be in a substantial amount of pain for a few days and would not take a bottle without pain. Based upon the testimony presented, this Court finds that N.C.'s frenulum injury constitutes child abuse under the CPSL.

### 3. Leg Fractures

In the course of the child abuse consult, Dr. Clarke also found "bucket-handle" fractures on N.C.'s legs. "Bucket-handle" fractures, or classic metaphyseal lesions, are a series of micro-fractures along the ends of the bones, which present in a bucket handle shape on X-ray radiographs. [N.T. Feb 12, p. 67-68]. Dr. Clarke testified that these injuries are "highly specific for child abuse" and do not occur with normal care—rather, they are typically seen with a yanking or jerking motion, as well as with flailing of the legs.[4] [N.T. Feb 12, p. 68]. While Dr. Clarke could not date the injuries exactly, she opined that the fractures were noticeable and probably acute to subacute. [N.T. Feb 12, p. 68-69]. Dr. Clarke also stated that N.C. became fussy when she touched his lower right leg. [N.T. Feb 12, p. 69]. In her medical opinion, Dr. Clarke states that these injuries would have caused N.C. substantial pain and any reasonable person should have known that he was injured. Id. The parents could not explain these injuries.

Dr. Clarke also ruled out any type of disease or other diagnosis that would possibly cause bone malformation, specifically osteogenesis imperfecta (brittle bone disease). [N.T. Feb 12, p. 81]. In her medical opinion, Dr. Clarke stated that

---

[4] Dr. Clarke also testified that this injuries can result from club foot repair or by pulling on the legs during child birth. However, she excluded these possibilities because J.B. stated that the child was pulled by his chest during birth. [N.T. Feb 12, p. 71].

12

osteogenesis imperfecta would result in mid-shaft diaphyseal fractures when the child begins to walk, unlike the end of shaft fractures seen on N.C.'s X-Ray radiographs. [N.T. Feb 12, p. 82]. Dr. Clarke also found no other diagnostic symptoms for osteogenesis imperfecta. [N.T. Feb 12, p. 81-82]. Further, Dr. Clarke also noted that osteogenesis imperfecta would not explain the other injuries suffered by N.C. [N.T. Feb 12, p. 82-83].

This Court finds that N.C.'s leg injuries were a result of child abuse. We find Dr. Clarke's testimony credible in all respects regarding the "bucket-handle" fractures, which are highly specific for child abuse and could not be explained by either parent. While J.B. argues that these injuries could have resulted from childbirth, there is no evidence that a physician or other person pulled N.C.'s legs to assist in birth. We also note that N.C. would have been in substantial pain and any reasonable person should have known that N.C. was injured. Based upon the testimony presented, this Court finds that N.C.'s leg injuries constitute child abuse under the CPSL.

4.    Liver Laceration

Dr. Clarke also found, through a computerized tomography (CT) scan, that N.C. suffered a liver laceration. [N.T. Feb 12, p. 64]. In her medical opinion, the severity of the laceration was a Grade Two out of four. [N.T. Feb 12, p. 65]. This finding alarmed Dr. Clarke because N.C. had no history of significant accidental trauma and this injury is typically caused by blunt force trauma to the belly. Id. Dr. Clarke testified that punching or other unilateral forces typically cannot cause this type of injury—instead, the force is applied as stomping or another really significant force where the child is on a hard surface. [N.T. Feb 12, p. 65-66]. Dr. Clarke also stated that the only symptom N.C. would have exhibited is fussiness and the same trauma that caused the rib fractures could have cause the liver laceration. [N.T. Feb 12, p. 93-94]. However, Dr. Clarke cautioned that the rib fracture alone could not have caused the laceration. [N.T. Feb 12, p. 94]. In

13

her medical opinion, Dr. Clarke states that N.C. would have been in substantial pain when this injury was inflicted and any reasonable person should have known the child was injured. [N.T. Feb 12, p. 66-67].

Dr. Clarke also discounts any of the explanations provided by J.C. regarding this injury. Similar to the rib fractures, Dr. Clarke indicated that J.C. could not have inflicted the liver laceration by catching N.C. by his chest, by pushing on N.C.'s chest while placing him in his car seat, or through N.C.'s alleged fall from the couch. [N.T. Feb 12, p. 75-76, 79-81]. J.B. indicated that she was unaware of this injury. [N.T. Mar 7, p. 137]. In Dr. Clarke's medical opinion, these injuries were the result of child abuse. [N.T. Feb 12, p. 85].

This Court finds that the liver laceration N.C. suffered was the result of child abuse. In the absence of any other explanation and taking into consideration the significant forces required to generate such an injury, we find that the only explanation for this injury is a blunt trauma force exerted upon the child. We are especially cognizant of Dr. Clarke's testimony that this injury is typically caused by some type of stomping or other trauma exerted while the child is against a hard surface. Dr. Clarke also specifically stated that such an injury would have caused N.C. substantial pain. Based upon the testimony presented, this Court finds clear and convincing evidence that N.C.'s liver laceration constitutes child abuse under the CPSL.

5.      Conclusion

Based upon the testimony presented, this Court finds that N.C. suffered child abuse. The testimony of Dr. Castel and Dr. Clarke, which this Court finds credible in all respects, shows that N.C. suffered a litany of injuries that are inconsistent with the normal care of an infant. It is clear to the Court that these injuries placed N.C. in substantial pain. We also find that the explanations proffered by the parents are entirely

14

inconsistent with the expert findings and fail to explain any of the injuries N.C. suffered. The Court finds that the expert findings and opinions, in combination with the lack of any reasonable explanation by the parents, constitutes clear and convincing evidence that N.C.'s injuries are the result of child abuse.

## B.   J.C. As An Alleged Perpetrator

This Court must now determine whether J.C. perpetrated the abuse against N.C. We find, preliminarily, that because (1) J.C. is one of N.C.'s parents and (2) N.C. suffered abuse "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions" of the parents, the Agency presented *prima facie* evidence of child abuse by J.C. This presumption is based upon J.B.'s admission that she and J.C. were N.C.'s primary caretakers from birth until this Court transferred custody to the Agency. We also find that the second prong is met because of N.C.'s young age, the lack of other persons present who would have access to him, and the severity of the injuries sustained—in essence, the Court finds that either J.B. or J.C. inflicted the abuse upon N.C. or failed to protect him from the same. See *In re L.Z.*, 111 A.3d 1164, 1185-86 (Pa. 2015) (finding that medical evidence of penile laceration, cheek bruising, and severe diaper rash and yeast infection "demonstrated that [c]hild's injuries were neither accidental nor self-inflicted and because was only in the care of [m]other and [a]unt, the injuries were shown to be a "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions" of the parent or other person responsible for the welfare of the child'"). Therefore, the burden shifts from the Agency to J.C., who must present evidence which rebuts this presumption.

15

This Court finds that J.C. failed to rebut this presumption and J.C. perpetrated these acts of abuse upon N.C. Both physicians testified that the rib and liver injuries suffered by N.C. would require a substantial amount of force—specifically, in the context of the liver injury, Dr. Clarke testified that N.C. must have suffered some type of blunt trauma to the belly akin to stomping or another significant force. [N.T. Feb. 12, p. 36, 65-66]. We find that it is entirely possible that either J.C. or J.B. inflicted these injuries—pursuant to our Supreme Court's decision in *L.Z.* and the presumption raised by Section 6381(d), we need not identify the individual parent who inflicted the abuse. *In re L.Z.*, 111 A.3d at 1186 (allowing conclusion that parent "perpetrated abuse on child either by inflicting the injuries or failing to protect [c]hild" from a caretaker related to the parent).

This Court also received a great deal of testimony regarding J.C.'s explanations for N.C.'s injuries. Dr. Clarke testified that J.C. first explained that N.C. fell from a couch. According to J.C., he left N.C. resting on pillow to go get N.C. a bottle and came back to find N.C. on the hardwood floor. [N.T. Feb 12, p. 72-73]. According to Dr. Clarke, it seemed as though J.C. and N.C. were alone during this alleged fall, and J.B. also could not remember whether she told Dr. Castel about this incident. [N.T. Feb 12, p. 73-74]. Dr. Clarke discounted this incident from explaining any of the injuries to N.C., as the fall described by J.C. could not generate the forces necessary to explain the injuries. [N.T. Feb 12, p. 75].

J.C. then proffered an explanation to Dr. Clarke wherein J.C. almost dropped the child. [N.T. Feb 12, p. 75]. According to J.C., N.C. dropped down to J.C.'s knee and J.C. caught N.C. around the chest before he hit the ground. Id. Dr. Clarke testified that J.C. did not indicate whether he suspected that the child was injured. Id. In her medical opinion, Dr. Clarke believes that this could not account for most of N.C.'s injuries,

16

including the newer rib fractures, face/lip bruising, frenulum injury, or the "bucket-handle" fractures. [N.T. Feb 12, p. 75-76]. Dr. Clarke also indicated that grabbing a child around the chest is a strange way to catch a falling child. Id.

J.C. also explained to Dr. Clarke that he recently pushed on N.C.'s chest to help N.C. breathe and heard a pop. [N.T. Feb 12, p. 76-77]. According to J.C., he pushed on the child's chest to help him remove some formula and thick mucosa that built up during a recent respiratory infection. Id. J.C. stated that the child seemed more content afterward. [N.T. Feb 12, p. 77]. J.C. could not tell Dr. Clarke how hard he was pushing, but stated that he believed he was not using a lot of force and did not believe that the pop represented a broken rib. [N.T. Feb 12, p. 77-78]. Dr. Clarke also discounted this explanation as unreasonable and outside the normal care or handling of a child.

Finally, J.C. explained to Dr. Clarke that he and J.B. recently had difficulty removing N.C. into his car seat. [N.T. Feb 12, p. 78-79]. According to J.C., he had to push on N.C. in order to remove N.C. from the vehicle. Id. J.B. concurred with J.C. and told Dr. Clarke how it was to remove N.C. from the seat. [N.T. Feb 12, p. 79]. Dr. Clarke disagreed with this explanation as well, as placing and removing a child from a car seat "should not cause any kind of injuries, let alone broken bones." Id.

With respect to all of these explanations, Dr. Clarke indicated that J.B. appeared to not know about the history of these incidents except for the car seat issue and the incident with the couch. [N.T. Feb 12, p. 96-97, 99]. In her medical opinion, these parents could not explain the injuries to N.C., none of the explanations were reasonable and could not happen with normal care or handling of a child. [N.T. Feb 12, p. 79-81]. Further, in the totality of the circumstances, Dr. Clarke opined that a reasonable person would have known that N.C. was hurt when any one of these injuries occurred. [N.T. Feb 12, p. 85].

17

This Court agrees with Dr. Clarke's conclusions and finds that all of J.C.'s explanations fail to account for N.C.'s injuries. We find Dr. Clarke's opinions both credible and persuasive upon the issue—we cannot conclude that N.C. would suffer injuries of such a severe magnitude through short falls, removal/placement in a car seat, or by pushing on his chest to facilitate the movement of mucosa. Even if this Court were to accept those explanations, the amount of force involved in any one of those explanations would still result in an injury requiring medical attention. We note that J.C. stated he took the child to the doctor for an x-ray radiograph after the couch fall, however there is no indication in the record that such a visit occurred. [N.T. Feb 12, p. 72].

This Court also received testimony from J.B. regarding the amount of time that she and J.C. spent caring for the child. After N.C.'s birth, J.B. took maternity leave from her job to care for N.C., living in a household with J.C. and her parents. [N.T. Mar 7, p. 126]. During that time, J.C. worked during the day, waking up around 4:30-5:00 A.M. and returning home around 5:00-6:00 P.M. [N.T. Mar 7, p. 129-30, 132-33]. J.B. also stated that there were periods of time where she left J.C. alone with N.C. and those times increased when the parents moved into a new apartment. [N.T. Mar 7, p. 137-39]. J.B.'s father, T.B., also noted J.C. and J.B. both had larger amounts of unsupervised time with N.C. [N.T. Mar 7, p. 155]. We note that BCCYF did not lodge any allegations of abuse against J.B.'s parents, and the record does not reflect that J.B.'s parents had unsupervised time with N.C. Therefore, based upon the testimony, we find that the only persons who had unsupervised access to N.C. were his parents.

18

Based upon all the evidence presented, we find that J.C. failed to rebut the presumption that he perpetrated the abuse against N.C. As stated before, this Court is not required to find that J.C. actually physically inflicted the abuse upon N.C.—rather, the Agency shifted the burden to J.C. to rebut the *prima facie* evidence that he perpetrated the abuse against N.C. The Agency established their *prima facie* case by presenting two experts who attribute N.C.'s injuries to child abuse and by showing that J.C. had unsupervised access to N.C. From there, the only evidence offered in some form of rebuttal were the explanations provided to Dr. Clarke. We accept Dr. Clarke's opinions regarding the infeasibility of these explanations to account for N.C.'s injuries. The Court finds no other evidence of record that would rebut the presumption that J.C. perpetrated abuse against N.C and J.C. declined to present any evidence in his own defense. Therefore, based upon the evidence presented, we find that J.C. failed to rebut the presumption that he abused N.C. and now enter a finding that J.C. perpetrated abuse against N.C.

### C. J.B. As An Alleged Perpetrator

This Court must now determine whether J.B. perpetrated the abuse against N.C. by omission. Similar to J.C., we find that because J.B. is one of N.C.'s parents and N.C. suffered abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parents, the Agency presented *prima facie* evidence that J.B. perpetrated the abuse against N.C. Therefore, it is J.B.'s burden to present evidence which rebuts this presumption.

19

As a preliminary matter, we note that Pennsylvania law allows this Court to raise the Section 6381 presumption in cases where the record fails to establish that the child was in the parent's care at the time of the injury. *In re L.Z.*, 111 A.3d 1164, 1176 (Pa. 2015). Our Supreme Court quoted an earlier decision of the Superior Court as to why the presumption may be raised in this context:

> The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required . . . . Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children.
>
> *In re L.Z.*, 111 A.3d at 1178 (quoting *In the Interest of J.R.W.*, 631 A.2d 1019, 1024 (Pa. Super. 1993)).

In this context, the law of this Commonwealth makes parents continuously "responsible for their children, absent extenuating circumstances." *In re L.Z.*, 111 A.3d at 1184. The statute "neither mentions nor focuses upon the parent or responsible person's physical presence at the time of the injury, but rather extends to both acts and omissions of the parent or responsible person." Id. Therefore, this Court is bound to hold parents "accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." Id. at 1185.

20

However, this presumption is rebuttable through various types of evidence:

> [T]he Legislature balanced the presumption of Section 6381(d) by making it rebuttable as it merely establishes "*prima facie* evidence" that the parent perpetrated the abuse. 23 Pa.C.S. § 6381(d). As commonly understood, *prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Black's Law Dictionary* 825 (6th ed. abridged 1991). Accordingly, evidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. **The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.**

*In re L.Z.*, 111 A.3d at 1185 (emphasis added).

J.B. agrees with the Agency's position that N.C. suffered child abuse. [N.T. Mar. 7, p. 126]. However, J.B. argues that she did not perpetrate this abuse. J.B. asserts that she only knew about N.C.'s frenulum injury and had no knowledge as to the rib fractures, leg fractures, or liver laceration. [N.T. Mar. 7, p. 137]. With respect to the frenulum injury, J.B. states that J.C. pulled a bottle from N.C.'s mouth and saw some bleeding. [N.T. Mar. 7, p. 134]. J.B. then states that she drove straight home to find that the bleeding had subsided. [N.T. Mar. 7, p. 134]. She further states that N.C.'s lip was not swollen or bruised. [N.T. Mar. 7, p. 134]. J.B. also points to the testimony of Dr. Clarke,

21

who could not estimate a timeframe in which N.C. would manifest the pain of these injuries.

J.B. also argues that she cannot be a perpetrator because she took N.C. for medical care whenever the child appeared ill. [N.T. Mar. 7, p. 120-22]. In support of this argument, J.B. points to doctor visits on September 22nd and September 24th, when neither doctor saw any marks, bruises, or callouses on N.C. Id. She also states that she did not speak with J.C. about any of the injuries before the child abuse consult with Dr. Clarke on October 1st. [N.T. Mar. 7, p. 124]. J.B. also points to periods of time where J.C. and N.C. were alone, stating that the abuse may have occurred during those periods of time.

The Agency argues that J.B. is a perpetrator by omission. It its memorandum, the Agency details that J.B. was N.C.'s primary caretaker for the first five weeks and then split this role with J.C. for the two weeks prior to September 30th . Def. Mem. at 6. The Agency also asserts that N.C. was in J.B.'s care around the clock except for intermittent periods of time (e.g. 15-20 minutes). Id. While recognizing that J.B. may not have inflicted the injuries to N.C., the Agency argues that J.B. should have recognized the rib injuries N.C. suffered within that period of time. Id. The Agency believes that J.B.'s actions in taking the child to the physician on September 30th may "mitigate some concern as to her culpability, [but] it does not fully explain how she would have been completely unaware of the totality of significant injuries this child suffered." Id. The Agency also points out that she has no explanation for these rib injuries, meaning that "she either caused those injuries herself and is lying, or she knew about the injuries when they occurred at the hands of [J.C.] and did not inform anyone." Id. at 6-7.

22

The Court finds that J.B. is a perpetrator by failing to act when N.C. suffered the injuries. While we understand that J.B. took the child to the doctor on three separate occasions between September 22nd and September 30th, the fact remains that J.B. was primarily responsible for N.C. for five weeks dating from August 10th. The testimony of Dr. Clarke, which this Court finds credible in all respects, establishes that N.C.'s healing rib fractures were at least three weeks old. Therefore, N.C. suffered those injuries while under J.B.'s almost total care.

Even if J.B. left N.C. in J.C.'s care for a period of thirty minutes, this Court believes that N.C. would outwardly manifest symptoms of pain throughout that time frame. We base this upon the expert testimony of both physicians, who indicated that the rib injuries would cause a substantial amount of pain and would outwardly manifest that pain such that a reasonable adult would know that the child was injured. Regardless of Dr. Clarke's inability to place a specific time window on that pain manifestation, this Court does not believe that J.B. would not have seen any signs or symptoms of the rib injuries. Both physicians indicated that a great deal of force is required to inflict these injuries, and that these injuries would cause a lot of pain, distress, and crying. The Court does not accept that N.C. only outwardly manifested the pain of these injuries for brief periods of time—assuming even that the abuse occurred right after J.B. left the home, the severity of these injuries must have been palpable upon J.B.'s return.

In this regard, we draw a corollary between the case at bar and *In re L.V.*, a recent Superior Court decision. In *L.V.*, the subject child suffered a number of life-threatening injuries, including "at least twenty-three rib fractures, two or three vertebrae fractures, two pelvic fractures, and a fracture to her left foot." *In re L.V.*, 127 A.3d 831, 835 (Pa. Super. 2015). In addition, the child also suffered "an acute subdural hemorrhage, as well

23

as lacerations to her spleen and liver, pulmonary contusions to both lungs, and small pneumothoraces." Id. In particular, the record established that some of the child's rib fractures were healing and could have been inflicted ten to fourteen days before presentation. Id. Upon presentation to the emergency department, the mother told physicians that the child was in father's care that day, as she was at work. Id. at 833. Father initially stated that the child fell out of the bed, but later admitted that he struck the child. Id. The trial court applied the Section 6381(d) presumption and found Mother to be a perpetrator of child abuse. Id. at 834.

Before the Superior Court, mother argued that she had not committed child abuse "as the record indicates that Child's injuries were inflicted by [f]ather, and [m]other had no reason to know that abuse was taking place." Id. at 837. The *L.V.* Court rejected this argument:

> We discern no abuse of discretion. As discussed . . . [c]hild suffered numerous severe injuries which would not ordinarily be sustained but for the acts or omissions of [m]other or [f]ather. While [c]hild was reportedly in the care of [f]ather when she sustained the injuries to her internal organs, some of [c]hild's rib fractures occurred between ten and fourteen days prior to [c]hild's hospitalization. There was no evidence presented by [m]other, or by anyone else, which demonstrated that [c]hild was in the care of [f]ather, rather than [m]other, at the time [c]hild's ribs were fractured. Thus, [m]other has failed to rebut the presumption that her actions, or failure to act, caused those injuries. Additionally, even if [m]other did not intentionally harm [c]hild, it is clear that she failed to stop [f]ather's abuse of [c]hild, and failed to seek medical treatment for [c]hild's fractured ribs. Mother's omissions endangered [c]hild's life, impaired [c]hild's functioning, and created an imminent risk of serious physical injury to [c]hild . . . . The record supports the conclusion of the trial court that [m]other committed "child abuse" pursuant to Section 6303(b)(1).

*In re L.V.*, 127 A.3d at 838.

24

While a number of the injuries N.C. suffered are less severe that those suffered by the child in *L.V.*, we find a similar circumstance in the case at bar regarding the rib fractures. This Court is not necessarily inferring that J.B. directly inflicted the abuse upon N.C., however, N.C.'s healing rib fractures occurred at a time when J.B. cared for N.C. almost around-the-clock. Regardless of the other injuries, we believe on that basis alone that J.B. endangered N.C. by failing to seek medical treatment for N.C.'s fractured ribs.

The Court also discredits J.B.'s explanation as to the frenulum injury. Both physicians testified that a burst frenulum would cause a substantial amount of bleeding, typically enough to trigger parents as to the serious nature of the injury. Based upon that testimony, this Court finds J.B.'s explanation that N.C.'s bleeding subsided by the time she got home to be entirely implausible. We also received testimony that this is an odd injury for an infant to suffer and could only be caused by substantial force, such as shoving a hard object into the infant's mouth. J.B. specifically testified that J.C. explained that he was removing a bottle from the infant's mouth and saw blood, replacing it with a cold bottle to stop the bleeding. These explanations are entirely inconsistent and this Court finds J.B.'s testimony self-serving.

With respect to the liver laceration and "bucket-handle" factures, this Court cannot determine that J.B. would have been on notice as to these injuries. While both of these injuries are fairly serious and both physicians testified that the child may have manifested some form of pain response, we cannot discern when these injuries occurred. Dr. Clarke specifically stated that she could not place a timeframe on the liver laceration and the only outward symptom would be fussiness. [N.T. Feb 12, p. 93]. Thus, unlike the timeline on the rib fractures, this Court cannot determine when N.C. would have manifested this pain—we believe it would be entirely speculative to find that J.B. knew

25

of these injuries. Similarly, with respect to the "bucket-handle" fractures, while we find that they were caused by abuse, Dr. Clarke testified that the only outward manifestation of these injuries might have been swollen legs or crying when changing the child's diaper. [N.T. Feb 12, p. 94]. Dr. Clarke also determined that these injuries were likely acute or subacute and testified that a reasonable parent might only know of the injury after manipulating the child's legs. [N.T. Feb 12, p. 68-69, 95]. These injuries may not have manifested in such a manner as to alert J.B. that N.C.'s legs were injured, and therefore we cannot find that J.B. knew about and ignored these injuries.

J.B.'s also argues that she cannot be a perpetrator because she took the child for medical care. On prior visits to Nason Hospital on September 22 and 24, J.B. brought N.C. in for a sick visit, where N.C. presented with bronchitis and issues similar to a common cold. [N.T. Feb 12, p. 42-44]. The evidence does not show that J.B. discussed any possible injuries with doctors on September 22 or 24, but J.B. explains that she did not discover these lumps until September 30. [N.T. Mar 7, p. 122-23]. When asked about these prior visits, Dr. Castel indicated that he did not conduct these examinations and did not know what examination those physicians performed. [N.T. Feb 12, p. 47]. Dr. Castel did, however, explain that these physicians, who saw N.C. for formula and respiratory issues, may only have listened to N.C.'s chest with a stethoscope rather than actually palpate the chest. [N.T. Feb 12, p. 45]. J.B. asserts that the doctors N.C. saw on September 22 and 24 manipulated his chest and found no lumps. [N.T. Mar 7, p. 119-22].

Based upon the testimony of both physicians, discussed *supra*, we discount J.B.'s argument that she did not discover the injuries until September 30. As shown above regarding the child abuse findings, it is clear to both physicians that these injuries existed well before September 30. We also find Dr. Castel's explanation about the September 22

26

and 24 visits—the record does not reflect what examinations these physicians performed and therefore we cannot unilaterally decide how these physicians examined N.C. nor accept J.B.'s testimony that these physicians examined N.C.'s chest. The records provided to Dr. Castel by Nason do not mention any type of chest examination performed on those dates and only indicate findings made with respect to the formula and congestion issues. The assertion that because two physicians could not find N.C.'s injuries shows that J.B. could not have known of these injuries is too speculative an inference for this Court. Even if this Court were provided a clearer record regarding these prior visits, it would be of no moment—we establish J.B. as a perpetrator of abuse based upon her nearly around-the-clock care of N.C. at the time when he suffered the rib injuries. The fact that two physicians may not have seen these injuries does not change the fact that N.C. suffered these injuries and, when they occurred, he was in J.B.'s nearly total care.

Finally, we must address J.B.'s last argument, which is in the nature of her personality and actions towards the child. We recognize that J.B. is making efforts to reunite with N.C. and has availed herself of multiple programs through BCCYF to assist in that process. J.B. asks the Court to consider this behavior in light of the serious allegations levied against her, arguing that her current behavior exemplifies her commitment to her children and that her care for her children shows that should could not be a perpetrator of abuse. J.B. Brief at 5-6, 8-9.

While this Court appreciates that J.B. is making efforts to reunite with her children, this present behavior cannot mask the evidence presented before this Court. These seemingly mitigating post-incidence circumstances that J.B. asks the Court to accept does not change the testimony of two experts regarding the abuse this child

27

suffered. Our findings of child abuse and J.B. and J.C. as perpetrators are made based upon the factual record placed before the Court.

In light of the foregoing, we find that J.B. failed to rebut the presumption enacted by Section 6381(d) and thus find that J.B. perpetrated abuse against N.C. by omission. As discussed *supra* with respect to J.C., we are not required to find by clear and convincing evidence that J.B. perpetrated the abuse—rather, the presumption of Section 6381(d) requires us to examine whether evidence presented by J.B. sufficiently rebuts the presumption. Based upon the large amount of time J.B. spent with N.C. in the first five weeks of his life and the co-parenting J.B. and J.C. provided up until the visit to Dr. Castel's office, we find that J.B. perpetrated the abuse either by inflicting said abuse upon N.C. or failing to prevent the same. The evidence presented in J.B.'s defense in no way aligns with any of either physicians' opinions nor does it present a logical reason for J.B.'s alleged failure to recognize these injuries.

## D.    Conclusion

In conclusion, the Court finds that N.C. suffered child abuse at the hands of his parents, J.C. and J.B. The testimony of both physicians clearly established that N.C. suffered some form of child abuse resulting in injury, which raises a presumption that N.C.'s parents, J.C. and J.B., abused N.C. J.C. failed to rebut this presumption, as all of his explanations for the child's injuries were entirely inconsistent with both experts' testimony and his explanations to Dr. Clarke lacked any type of internal consistency with J.B.'s limited explanations. J.B. similarly failed to rebut this presumption. With respect to the rib injuries, J.B. was N.C.'s nearly around-the-clock caretaker when N.C. suffered the first rib injuries and indicated that she was unaware of the injuries. In regard to the lip injury, J.B. presented a story entirely inconsistent with J.C.'s explanation to Dr. Clarke. While the Court cannot impute knowledge of N.C.'s other injuries upon J.B., we

28

find J.B.'s lack of response to the rib and lip injuries sufficient to sustain a finding that J.B. perpetrated the abuse upon N.C.

## II. MOTION FOR AGGRAVATED CIRCUMSTANCES

In light of our finding regarding child abuse, this Court must now determine the merits of the Agency's Motion for Aggravated Circumstances against J.C. as a perpetrator of abuse and J.B. for aggravated physical neglect.

The Agency argues that aggravated circumstances are appropriate based upon the injuries N.C. suffered. In support, the Agency supports the *L.V.* case, discussed *supra*, for the proposition that N.C. suffered injuries consistent with serious bodily injury and that aggravated circumstances exist as to J.C. and J.B. The Agency points to N.C.'s multiple injuries, as well as the fact that J.B. failed to "protect the child from the father and . . . fail[ed] to seek medical treatment when she became aware of the older rib injuries during the time she was with the child almost constantly." Agency Brief at 7.

Both J.B. and J.C. present no position relative to this motion. However, based upon J.B.'s opposition to a finding of child abuse, the Court believes that J.B. is also in opposition to a finding of aggravated circumstances.

The Court finds that aggravated circumstances do not exist. We agree with the Agency's position, but we decline to find that the injuries constituted a life-threatening condition or that the injuries have impaired N.C. Both physicians testified that N.C. is healing well, and Dr. Castel specifically stated that his follow up showed no developmental delays. Based upon our reading of *L.V.* and other cases, aggravated circumstances in physical abuse cases are reserved for, consistent with the statute, injuries that are life-threatening or substantial impair the child's functioning. Compare *In re R.P.*, 957 A.2d 1205 (Pa. Super. 2008) (finding aggravated circumstances where expert testified that child's condition was life threatening with one hundred bruises, skull

29

fracture, hip fracture, and a bilateral subdural hematoma) with *B.J.S. In the Interest of J.R.*, 2013 WL 11238186 (Pa. Super. 2013) (declining aggravated circumstances where review of injuries, including bruising on head and neck, fracture of left leg, and fracture of rib which were not permanently disfiguring and did not cause protected loss or impairment of bodily member did not constitute "serious bodily injury"). We believe that, in the context of aggravated circumstances, the statute and decisions of our Superior Court require either severity of injuries that put the child's life in jeopardy or injuries which impair or cause protracted loss. In the case at bar, neither physician testified that these injuries were life threatening nor did either physician testify that these injuries resulted in protracted loss or impairment of any appendage or organ. Without any further indication that N.C.'s injuries were life-threatening or resulted in continuing impairment, we are constrained to find that aggravated circumstances do not exist.

In light of the foregoing opinion, we now enter the following Order:

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

IN THE INTEREST OF
N.C., a minor

     :
     :
     :   CP-07-DP-120-2015
     :
     :   FID#07-FN-00065-2015
     :

| | |
|---|---|
| HON. TIMOTHY M. SULLIVAN | PRESIDING JUDGE |
| JUSTIN WITT, ESQUIRE | COUNSEL FOR BCCYF |
| TRACI L. NAUGLE, ESQUIRE | COUNSEL FOR MOTHER |
| ASHLAN CLARK, ESQUIRE | COUNSEL FOR FATHER |
| TYLER A. ROWLES, ESQUIRE | GUARDIAN AD LITEM |

## *ORDER*

AND NOW, this **30 th** day of June, 2016, consistent with the foregoing Opinion, it is hereby **ORDERED, DIRECTED and DECREED** as follows:

1.    The court confirms the finding of child abuse in relation to Childline #7446605 (as set forth in the CY48 Form admitted into the record during the March 7, 2016 hearing as Petitioner's Exhibit "1"). As a result, the Agency's indicated report is "**founded**" as to both parents, J.C. and J.B., which arises out of the same set of facts and circumstances as the Agency's indicated finding relative to Childline #7446605.

2.    For the reasons stated in our aforesaid Opinion, we **deny** the Agency's Motion for Finding of Aggravated Circumstances alleged against both parents.

BY THE COURT:

_____
                            J.