J-S80019-16
J-S80020-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K., A MINOR AND M.K., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF J.K., FATHER | : | No. 1024 MDA 2016 |

Appeal from the Order Entered May 26, 2016
in the Court of Common Pleas of Lebanon County
Juvenile Division at Nos:  CP-38-DP-0000001-2016,
CP-38-DP-0000002-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: A.K., M.K., S.D., MINORS | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  K.S., MOTHER | : | No. 1025 MDA 2016 |

Appeal from the Order Entered May 26, 2016
in the Court of Common Pleas of Lebanon County
Juvenile Division at Nos:  CP-38-DP-0000001-2016, CP-38-DP-0000002-
2016, CP-38-DP-0000003-2016

BEFORE:  LAZARUS, STABILE, and RANSOM, JJ.

MEMORANDUM BY STABILE, J.:　　　　　　　　　　**FILED JUNE 22, 2017**

In these consolidated appeals, J.K. ("Father") and K.S. ("Mother") challenge the order entered May 26, 2016, in the Court of Common Pleas of Lebanon County, finding aggravated circumstances and directing that no

additional efforts should be made to reunify them with their minor children.[1] Also before us is a motion to dismiss filed by Lebanon County Children and Youth Services ("CYS") on December 1, 2016. After careful review, we affirm the order finding aggravated circumstances, and we deny the motion to dismiss.

The children at issue in this appeal are S.D., a female born in February 2006, M.K., a female born in July 2009, and A.K.1, a male born in August 2015. M.K. and A.K.1 are the children of both Father and Mother, while S.D. is the child of Mother only.[2] CYS became involved with S.D., M.K., and A.K.1 following the death of A.K.1's twin brother, A.K.2., on January 12, 2016. The record reveals that Father was at home with the children that day, while Mother was at work. N.T., 4/18/16, at 32. At some point in the early evening, Father put A.K.2 to sleep by laying him on his abdomen in a swing, with his head tilted to the side, and with a blanket covering most of his face.[3] *Id.* at 10, 32, 51-52. M.K. later picked up A.K.2 so that she could hold him, but Father instructed M.K. that she had leave A.K.2 lying down so

---

[1] We have consolidated these appeals *sua sponte*. **See** Pa.R.A.P. 513.

[2] Mother reportedly does not know the identity of S.D.'s father. N.T., 4/18/16, at 8-9.

[3] According to the pleadings filed in this matter, Father indicated that he put A.K.2 to sleep at approximately 7:45 p.m. **See, e.g.**, Dependency Petition (S.D.), 2/10/16, at 3.

that he would stay asleep, and placed A.K.2 back in his previous position. *Id.* at 33. Father then failed to monitor A.K.2. During that evening, Father left the children home alone and spent approximately fifteen minutes at a local bar purchasing beer. *Id.* at 32, 50. Father then returned home and watched television. *Id.* at 32. Mother returned home at approximately 9:15 p.m., ate dinner, and also watched television.[4] *Id.* at 32, 51. Neither Father nor Mother checked on A.K.2 until approximately 10:30 p.m., at which time they discovered that he was non-responsive and no longer breathing. *Id.* at 10-11, 32, 51. Following's A.K.2's death, both he and A.K.1. received skeletal surveys at Hershey Medical Center. *Id.* at 16, 20. A.K.2's skeletal survey revealed that he had suffered two left rib fractures, which were six to eight weeks old, as well as a possible acute right rib fracture, and a compression fracture of his spine. *Id.* at 16, 73-74. A.K.1's skeletal survey revealed that he had a healed right rib fracture. *Id.* at 20, 87.

As a result of these events, CYS filed applications for emergency protective custody of S.D., M.K., and A.K.1 on January 29, 2016.[5] The trial

_____

[4] Mother cannot drive, and Father routinely left the children home alone in order to transport her to and from work. N.T., 4/18/16, at 44. It is not clear from the record whether Father left the home to transport Mother on January 12, 2016.

[5] In its applications, CYS averred that S.D., M.K., and A.K.1 were already in foster care, because Father and Mother signed a voluntary placement agreement on January 27, 2017, and because the trial court issued a verbal

*(Footnote Continued Next Page)*

court entered orders for emergency protective custody and shelter care orders on February 1, 2016. CYS filed dependency petitions on February 10, 2016, and motions for finding of aggravated circumstances on March 21, 2016. In its motions for finding of aggravated circumstances, CYS averred that it investigated a report of suspected child abuse concerning the death of A.K.2. *See, e.g.*, Motion for Finding of Aggravated Circumstances (S.D.), 3/21/16, at ¶ 5-8. CYS averred that the allegations of child abuse included "whether the Father and the Mother caused the death of a child through any act or failure to act and whether that act or failure to act was reckless and resulted in asphyxiation[,]" and that the report was indicated as to both Father and Mother. *Id.* at ¶ 8. The court held a dependency and aggravated circumstances hearing on April 18, 2016, and entered orders adjudicating S.D., M.K., and A.K.1 dependent on April 20, 2016. On April 21, 2016, the court entered an order directing the parties to provide the court "with any written closing statements/briefs or memorandums of law on the issue of whether or not aggravated circumstances applies in this case." Order, 4/21/16.

On May 26, 2016, the court entered an order finding aggravated circumstances, directing that no additional efforts should be made to reunify Father and Mother with M.K. and A.K.1, and directing that no additional

*(Footnote Continued)* ───────────

order granting emergency custody to CYS on January 28, 2016. *See, e.g.*, Application for Emergency Protective Custody (S.D.), 1/29/16, at 4.

- 4 -

efforts should be made to reunify Mother with S.D.[6]  In its opinion accompanying the order, the court found that Father inflicted serious bodily injuries to both A.K.1 and A.K.2, as evidenced by the rib fracture suffered by A.K.1, and by the rib and spine fractures suffered by A.K.2.  Trial Court Opinion, 5/26/16, at 10-11.  The court further found that Mother inflicted serious bodily injuries to A.K.1 and A.K.2 by omission, in that she failed to protect A.K.1 and A.K.2 from Father.  *Id.*  Next, the court found that Father neglected A.K.2 by putting him to sleep in a dangerous position and then failing to check on him, and that Mother neglected A.K.2 by failing to check on him after Father put him to sleep.  *Id.* at 11.  The court found that Father and Mother habitually neglected their children by leaving them at home by themselves, and by allowing S.D. and M.K. to handle A.K.1 and A.K.2 in a dangerous manner.  *Id.*  Mother timely filed a notice of appeal on June 22, 2016.  Father timely filed a notice of appeal on June 23, 2016.[7, 8]

_____

[6] The trial court did not make a finding that Father or Mother committed "child abuse" pursuant to the Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301–6386.

[7] Both Father and Mother failed to file concise statements of errors complained of on appeal at the same time as their notices of appeal pursuant to Pa.R.A.P. 905(a)(2) and 1925(a)(2)(i).  As a result, the trial court ordered Father and Mother to file concise statements on June 23, 2016.  Mother complied with the court's order by filing a concise statement on June 27, 2016, and Father complied with the court's order by filing a concise statement on June 28, 2016.  We have accepted these concise statements pursuant to *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009) (holding that the appellant's failure to comply strictly with Pa.R.A.P.
*(Footnote Continued Next Page)*

Before addressing the merits of these appeals, we first must consider the motion to dismiss filed by CYS. In its motion, CYS seeks dismissal on the basis that Father and Mother failed to request the transcript of the August 18, 2016 dependency and aggravated circumstances hearing.[9] By way of background, Mother filed a transcript request on June 22, 2017, the same day that she filed her notice of appeal. However, Mother mistakenly requested the transcript of a permanency review hearing held on June 13, 2016. The children's guardian *ad litem* also filed a transcript request on June 30, 2016, but she too requested the wrong transcript. Father did not file a transcript request. On November 21, 2016, this Court entered a *per curiam* order directing that the correct transcript be requested within five days. On December 1, 2016, CYS filed a motion to dismiss these appeals. In its motion, CYS averred that a transcript request had not yet been filed as of the morning of November 30, 2016. In Father's answer to the motion, filed December 7, 2016, he averred that his counsel did not review our

_(Footnote Continued)_ ──────────

1925(a)(2)(i) did not warrant waiver of her claims, as there was no prejudice to any party).

[8] This Court treats aggravated circumstances orders as appealable collateral orders pursuant to **In re R.C.**, 945 A.2d 182 (Pa. Super. 2008).

[9] The motion to dismiss included only Mother's appeal in its caption. However, the motion listed Father's appeal as a related case, Father filed an answer to the motion, and this Court treated the motion as applying to Father's appeal as well.

November 21, 2016 order until November 28, 2016, and promptly filed a transcript request on November 30, 2016. Similarly, in Mother's answer to the motion, filed December 9, 2016, she averred that her counsel was out of the office from the afternoon of November 23, 2016, until November 29, 2016, and promptly filed a transcript request after his return on December 1, 2016. On January 3, 2017, this Court entered a *per curiam* order deferring the disposition of the motion to dismiss until our merits review of these appeals.[10]

As this Court has stressed, our Rules of Appellate Procedure require "an appellant to order and pay for any transcript necessary to permit resolution of the issues raised on appeal." **Commonwealth v. Preston**, 904 A.2d 1, 7 (Pa. Super. 2006), *appeal denied*, 916 A.2d 632 (Pa. 2007) (citing Pa.R.A.P. 1911(a)). In the event an appellant fails to order a necessary transcript, this Court is empowered to deem waived the appellant's claims, or to dismiss the appeal. **Id.** (citing **Commonwealth v. Williams**, 715 A.2d 1101, 1105 (Pa. 1998)); Pa.R.A.P. 1911(d).

Here, our review of the record reveals that Father and Mother failed to request the transcript of the April 18, 2016 dependency and aggravated circumstances hearing. As a result of this procedural error, we were rendered unable to review the merits of their appeals for several months.

---

[10] This Court did not receive the correct transcript until March 7, 2017.

However, Father and Mother requested the relevant transcript within a reasonable period of time after being ordered to do so by this Court. Further, this is a Children's Fast Track appeal. This Court has a critical interest in ensuring that the trial court's order serves the best interests of S.D., M.K., and A.K.1, and in ensuring that the court's order respects the rights of Father and Mother as parents. In light of these critical interests, and because we discern no prejudice, we decline to find that Father and Mother waived their claims, and we decline to dismiss these appeals. We therefore deny the motion filed by CYS.

We may now turn to the merits of these appeals. Father raises two interrelated issues for our review.

> 1. Did the [trial c]ourt err in finding that aggravated circumstances exist as to A.K.[1], and that no additional efforts should be made to reunify the minor child with Father[?]
>
> 2. Did the [trial c]ourt err in finding that aggravated circumstances exist as to M.K[.], [and] that no additional efforts should be made to reunify the minor child with Father[?]

Father's Brief at 2.

In addition, Mother raises three interrelated issues for our review.

> 1. Did the [trial c]ourt commit[] prejudicial error in finding that aggravated circumstances existed in the case of [A.K.1] and [o]rder[ing] that [CYS] take no further steps in reunifying [Mother] with her child?
>
> 2. Did the [trial c]ourt commit[] prejudicial error in finding that aggravated circumstances existed in the case of [M.K.] and [o]rder[ing] that [CYS] take no further steps in reunifying [Mother] with her child?

3. Whether the [trial c]ourt committed prejudicial error in finding that aggravated circumstances existed in the case of [S.D.] and [o]rder[ing] that [CYS] take no further steps in reunifying [Mother] with her child?

Mother's Brief at 15.

We consider these claims mindful of our well-settled standard of review.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)).

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301–6375. The Juvenile Act provides that a child may be adjudicated dependent if he or she meets the requirements of one of ten definitions listed at 42 Pa.C.S.A § 6302. If a trial court determines that a child is dependent, and aggravated circumstances have been alleged by either the county agency or by the child's attorney, the court must also determine whether aggravated circumstances exist. 42 Pa.C.S.A § 6341(c.1). Critically, a court may not find aggravated circumstances absent a finding of dependency. *Id.* If the court finds from clear and convincing evidence that aggravated circumstances exist, the court must then consider whether reasonable efforts should be made to reunify the child with his or her parent or parents. *Id.* Following a finding of aggravated circumstances,

- 9 -

"[a] court may end reasonable efforts at its discretion." ***In re L.V.***, 127 A.3d 831, 839 (Pa. Super. 2015) (citing ***In re A.H.***, 763 A.2d 873, 878 (Pa. Super. 2000)).

The Juvenile Act defines aggravated circumstances as follows, in relevant part.

> **"Aggravated circumstances."** Any of the following circumstances:
>
> \*\*\*
>
> (2) The child **or another child of the parent** has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> \*\*\*

42 Pa.C.S.A. § 6302 (emphasis added). The Juvenile Act defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." ***Id.*** "Aggravated physical neglect" is defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." ***Id.***

On appeal, Father and Mother first challenge the trial court's finding that aggravated circumstances exist due to serious bodily injuries suffered by A.K.1 and A.K.2. Father argues that the evidence does not support such a finding because neither child had visible bruises, and because there was no evidence that he was aware the children had bone fractures or that he

- 10 -

intended to cause bone fractures.  Father's Brief at 8, 10.  Similarly, Mother argues that there was no evidence presented during the dependency and aggravated circumstances hearing to establish that she physically abused any of her children.  Mother's Brief at 18-23.  We agree that the evidence presented during the hearing does not support a finding of aggravated circumstances due to serious bodily injury, although our reasoning differs from the arguments presented by Father and Mother.

Initially, it is clear that the death of A.K.2 does not support a finding of aggravated circumstances due to serious bodily injury.  Pursuant to the plain language of Section 6302, serious bodily injury will only support a finding of aggravated circumstances if it results from "physical abuse."  ***See*** 42 Pa.C.S.A. § 6302.  In this case, CYS presented compelling evidence to prove that A.K.2 was the victim of physical abuse resulting in fractured ribs and a fractured spine.  However, there was no evidence that this abuse was the cause of A.K.2's death.

Moreover, CYS failed to present evidence that the rib and spine fractures suffered by A.K.1 and A.K.2 were "serious bodily injuries."  As noted above, a serious bodily injury is one that causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.  ***See id.***  While it is clear that the fractures suffered by A.K.1 and A.K.2 were abusive and tragic, there was no testimony presented during the dependency and aggravated circumstances hearing to establish

that the fractures were life-threatening, or that they would have caused protracted impairment of the children's functioning. During the hearing, the trial court heard the testimony of pediatrician Kathryn Crowell, M.D., who evaluates suspected abuse or neglect as a member of the child protection team at Penn State Hershey Children's Hospital. N.T., 4/18/16, at 68. At best, Dr. Crowell testified that A.K.1's rib fracture would have caused "some pain and discomfort," and that "[y]ou would think" that A.K.2's spine fracture "would have caused pain." *Id.* at 91-92. This evidence falls short of that required for a finding of physical abuse resulting in serious bodily injury.

Mother and Father next contend that the record does not support a finding of aggravated circumstances due to aggravated physical neglect. Neither parent challenges the allegation that A.K.2 asphyxiated as a result of the dangerous sleeping position that he was placed in by Father. Instead, Father argues that his actions on January 12, 2016, were merely negligent, and did not rise to the level of aggravated physical neglect. Father's Brief at 9. Mother argues that A.K.2's death was the result of "one unfortunate, tragic accident," and that an accidental death cannot support a finding of aggravated circumstances. Mother's Brief at 20-23. We disagree.

During the hearing, CYS presented the testimony of child protective services investigator, Ana Marquez. Ms. Marquez testified that she investigated a report of suspected child abuse concerning A.K.2's death, and

- 12 -

that the report was indicated as to both Father and Mother. N.T., 4/18/16, at 9-10. In support of this determination, Ms. Marquez testified concerning two photographs depicting A.K.2's sleeping position on the evening that he died, which were entered into evidence as Exhibit 2 and Exhibit 3. *Id.* at 14. In the photographs, Father is shown recreating A.K.2's sleeping position by placing A.K.1 in an identical position in the same swing. *Id.* at 11-13.

In Exhibit 2, A.K.1 is shown lying on his abdomen in the swing. A.K.1 has a small blanket either placed over him or wrapped around him, with only A.K.1's face, and his legs from the knees down, being visible. A.K.1's face appears to be turned slightly to the left, but his nose and face are pressed directly against the padding of the swing. In addition, the blanket partially covers A.K.1's face starting about halfway down his cheek. In Exhibit 3, A.K.1 is in the same position as before, but this time has a thicker blanket placed on top of him. This thicker blanket covers A.K.1's entire body, other than the top of A.K.1's head. The blanket covers A.K.1's face starting just below his eye.

As to why this sleeping position would be dangerous, the trial court heard the testimony of the children's former pediatrician, Gene P. Otto III, M.D. Upon examining Exhibit 2 and Exhibit 3, Dr. Otto testified that Father placed A.K.1 "in the wrong sleeping position and on the wrong sleeping surface." *Id.* Dr. Otto expressed particular concern regarding the padding

of the swing. He explained, "The soft surface allows the baby to sink into the surface and not raise it's [*sic*] head out of it as it needs to." *Id.*

Concerning the parents' knowledge of safe sleeping positions, Dr. Crowell testified that both A.K.1 and A.K.2 were born at Penn State Hershey Children's Hospital. *Id.* at 72, 77-78. Dr. Crowell explained that the staff at Children's Hospital instructs parents that babies should sleep on their back until they are old enough roll over regularly by themselves, which can be as early as four months, but varies from baby to baby. *Id.* at 79, 81. Parents also are instructed that the baby's crib should be "fairly empty," and that babies should not sleep with "big fluffy blankets or pillows, and no soft toys." *Id.* Upon reviewing the relevant medical records, Dr. Crowell testified that Father refused to receive certain instruction from the nursing staff at Children's Hospital, although she was not sure what type of instruction that was. *Id.* at 84. Dr. Crowell explained, "Father had said he didn't need to receive that information, that he had other children and was familiar with it." *Id.*

As noted above, the Juvenile Act defines "aggravated physical neglect" as any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning. *See* 42 Pa.C.S.A. § 6302. With respect to Father, the record confirms that he put A.K.2 to sleep in a position that was dangerous. Father then failed to monitor A.K.2 and to ensure his safety. Father's actions, and his failures to act, were

omissions in the care of A.K.2, and resulted in A.K.2's death by asphyxiation. Thus, it is clear that these omissions placed A.K.2 in a life-threatening condition and seriously impaired his functioning.[11]

With respect to Mother, the record confirms that she too engaged in omissions in the care of A.K.2. Mother arrived home from work at 9:15 p.m. on January 12, 2016, but made no effort to check on A.K.2. for over an hour knowing that Father left the children alone while he picked her up from work. Instead, Mother ate dinner and watched television. By the time Mother went to check on A.K.2 at 10:30 p.m., he was already non-responsive and no longer breathing. Contrary to Mother's argument, this act of neglect was not an isolated incident. Among other things, the record reveals that Mother habitually neglected S.D., M.K., A.K.1, and A.K.2 by leaving them home alone while Father drove her to work. Thus, Mother shares responsibility for the death of A.K.2.

Accordingly, because A.K.2 was a victim of aggravated physical neglect, aggravated circumstances exist with respect to S.D., M.K., and

_____

[11] The Juvenile Act is unclear as to what constitutes a "life-threatening condition." The language of Section 6302 does not specify whether "life-threatening condition" means that the child must sustain a life-threatening injury, or whether placing a child in a situation where he or she might sustain such an injury would suffice. Under either interpretation, A.K.2 was placed in a "life-threatening condition" by Father.

A.K.1.[12]  **See** 42 Pa.C.S.A. § 6302; ***In the Interest of S.B.***, 833 A.2d 870 (Pa. Super. 2003) (finding of aggravated circumstance based upon sexual abuse of one child is sufficient to support a dependency determination of sibling not subject of abuse).  We therefore conclude that the trial court did not abuse its discretion by entering its May 26, 2016 aggravated circumstances order, or by directing that Father and Mother should not be provided with reunification efforts.

Order affirmed.  Motion to dismiss denied.

Judge Lazarus joins the memorandum.

Judge Ransom concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2017

_____

[12] Our holding in this matter should not be construed to suggest that aggravated circumstances exist in every case where a child's sibling passes away due to Sudden Infant Death Syndrome, commonly referred to as "SIDS," or due to other unexplained circumstances.  As we stressed above, a trial court may only find aggravated circumstances if it first determines that a child is dependent.  Often, this means that a court must find that a child is without proper parental care or control.  **See** 42 Pa.C.S.A. § 6302.  If a parent exercises proper parental care and control and his or her child passes away due to a tragic accident, that parent's remaining children would not be dependent, and a finding of aggravated circumstances could not be made.