J-S60031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.V., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.M., MOTHER | |
| | No. 1116 EDA 2015 |

Appeal from the Order Entered March 17, 2015
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-002320-2014
CP-51-DP-0002528-2014

BEFORE: BENDER, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY OTT, J.: **FILED OCTOBER 02, 2015**

R.M. ("Mother") appeals from the order entered March 17, 2015, in the Court of Common Pleas of Philadelphia County, which adjudicated dependent her minor daughter, L.V. ("Child"), born in March of 2014. The order further provided that Mother had committed "child abuse" pursuant to the Child Protective Services Law ("CPSL"), 23 Pa.C.S.A. §§ 6301–6386, and that Mother's visits with Child would remain suspended. In addition, Mother appeals from a separate order entered that same day, which indicated that aggravated circumstances were present, and that the Philadelphia

Department of Human Services ("DHS") need not make efforts to reunify Child with her parents.[1]  We affirm.

On October 19, 2014, Mother and Father brought Child to the Emergency Department at Children's Hospital of Philadelphia ("CHOP"), where it was discovered that Child had suffered numerous injuries, some of which were life-threatening.  N.T., 3/17/2015, at 15, 17-26, 39-40.  Mother reported that Child had been in the care of Father that day, while Mother was at work.  *Id.* at 86.  Father initially claimed that Child rolled off of a bed while he was in the shower.  *Id.* at 67.  However, Father later admitted that he hit Child.  *Id.* at 71.  Father was arrested and incarcerated as a result of Child's injuries.  *Id.* at 68.

Meanwhile, DHS obtained an order of protective custody with respect to Child on October 27, 2014.  A shelter care hearing was held on October 29, 2014, and Child's commitment to DHS was ordered to stand.  DHS filed a dependency petition on November 17, 2014, and a dependency hearing was held on March 17, 2015.  During the hearing, the trial court heard the testimony of Dr. Carla Parkin Joseph[2]; DHS social worker, Anthony Hussey; Community Umbrella Agency case manager, Christoria Releford; and

---

[1] Child's father, D.V. ("Father"), did not file a notice of appeal from the trial court's orders.

[2] Dr. Joseph's name is also written as "Parker Joseph" in the transcript of the dependency hearing.  *See* N.T., 3/17/2015, at 11-12.

Mother's mother, S.M. (Maternal Grandmother). Following the hearing, the trial court entered its order adjudicating Child dependent, providing that Mother had committed "child abuse" pursuant to the CPSL, and providing that Mother's visits with Child would remain suspended.[3] The court also entered its order finding aggravated circumstances and indicating that DHS need not provide reunification services.[4] Mother timely filed a notice of appeal on April 13, 2015, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

[1.] Whether the trial court erred and/or abused its discretion by adjudicating the child dependent pursuant to 42 Pa. C.S.A. 6302 and 6341[?]

[2.] Whether the trial court erred and/or abused its discretion by determining that Mother was responsible for the child abuse pursuant to 23 Pa. C.S.A. 6381[?]

[3.] Whether the trial court erred and/or abused its discretion by making a finding of Aggravated Circumstances as to Mother pursuant to 42 Pa. C.S.A. 6302[?]

[4.] Whether the trial court erred and/or abused its discretion by making a determination that DHS need not make reasonable efforts to reunify with Mother[?]

_____

[3] Mother's visits originally were suspended by a December 9, 2014, continuance order. The order permitted Mother to attend Child's medical appointments only. The order adjudicating Child dependent does not specify whether Mother may continue to attend Child's medical appointments.

[4] While the trial court permitted DHS to end reunification services, the court's adjudication order provided that Child's permanency goal would be "return to parent or guardian."

[5.] Whether the trial court erred and/or abused its discretion by suspending Mother's visits and contact with the child[?]

Mother's brief at 4 (trial court answers omitted).

We first address Mother's claim that the trial court erred and/or abused its discretion by adjudicating Child dependent. Mother asserts that she provided appropriate care for Child, had no reason to believe that Father was harming Child, and participated in various services after Child's injuries were discovered. Mother's brief at 13-16.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (quoting *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)).

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6375. The Juvenile Act defines "dependent child" as follows, in relevant part.

> **"Dependent child."** A child who:
>
> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled

- 4 -

substance that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S.A. § 6302. In order to adjudicate a child dependent, the court must determine that the above definition has been met by clear and convincing evidence. **A.B.**, 63 A.3d at 349.

Instantly, the trial court found that Child was dependent as a result of the severe abuse inflicted on Child by Father, and as a result of Mother's failure to seek medical treatment for Child's injuries prior to October 19, 2014. Trial Court Opinion, 6/9/2015, at 1-5 (unpaginated). The court also noted that Mother continues to have a relationship with Father. **Id.** at 3-4.

After a thorough review of the record in this matter, we conclude that the trial court did not abuse its discretion. Dr. Carla Parkin Joseph testified that she is a fellow in the Department of Child Abuse Pediatrics at CHOP, and that she was part of a team that conducted an evaluation of Child on October 20, 2014. N.T., 3/17/2015, at 12, 14-15. Dr. Joseph determined that Child had suffered at least twenty-three rib fractures, two or three vertebrae fractures, two pelvic fractures, and a fracture to her left foot. **Id.** at 39-40. In addition, Child suffered an acute subdural hemorrhage, as well as lacerations to her spleen and liver, pulmonary contusions to both lungs, and small pneumothoraces on both sides of her torso. **Id.** at 19-20. There was "some evidence" that Child suffered an acute kidney injury, which may have been caused by blood loss associated with the other injuries. **Id.** at

22-26. Based on these injuries, Child was certified as a "near fatality." *Id.* at 26.

Dr. Joseph further explained that some of Child's rib fractures showed signs of healing, while others did not. *Id.* at 18, 23. The rib fractures that were in the process of healing would have occurred about ten to fourteen days prior to the date Child was hospitalized, while the rib fractures that had not yet begun to heal would have occurred a few minutes to about ten days prior to Child's hospitalization. *Id.* at 23. Dr. Joseph testified as follows.

> **Q.** . . . . Now, you stated the healing fractures, how much to a degree of certainty is [it that the fractures] happened between 10 and 14 days?
>
> **A.** So we see the healing of the bones and we see that callous formation at about 10 or 14 days. And that's really an estimate and, unfortunately, looking at these images and these x-rays is not an exact science so it could be a range and that's why we say usually about 10-to-14 days is when we start to see that healing.
>
> **Q.** . . . . So that actually would be the 5th until the 18th [of October] from your estimate would be 10-to-14 days before?
>
> **A.** So between the 5th and the 9th I guess would be the 10-to-14 days.
>
> **Q.** . . . . What if any symptoms would a baby show that had previous injuries such as these?
>
> **A.** So she would be noted to be in pain with normal handling with the number of rib fractures that she had even normal handling could cause pain, fussiness in a 7[-]month[-]old child. . . . .

*Id.* at 48-49.

Dr. Joseph believed that the injuries to Child's organs occurred within twenty-four hours prior to her hospitalization. *Id.* at 22. Child's subdural hemorrhage was indicative of "abusive head trauma, which could be related to a shaking mechanism or a direct impact to the head." *Id.* at 36. Child's abdominal injuries likely occurred as a result of a direct blow or other direct trauma to the abdomen. *Id.* at 37. Dr. Joseph opined that Child's injuries would not occur as a result of normal care, and that Child had been the victim of non-accidental trauma or physical abuse. *Id.* at 23, 31, 36-37.

In addition, Dr. Joseph testified that Child previously had been brought to the Emergency Department at CHOP on September 30, 2014, due to second degree burns to her right hand and right foot. *Id.* at 25, 41. Mother and Father claimed that the burns occurred while Child was receiving a bath. *Id.* at 25, 44. Reportedly, "the family had just moved into a new home and had not realized that the hot and cold water was switched . . . ." *Id.* at 25. Child was treated and discharged, "with a plan to follow up with our burn clinic in about three to five days." *Id.* However, Mother and Father did not bring Child back for any follow-up treatment.[5] *Id.*

---

[5] Dr. Joseph also noted that, during a visit at Child's primary care office on an unspecified date, a physician observed that Child had certain facial abnormalities, and requested that Child be tested for a possible genetic syndrome. N.T., 3/17/2015, at 42. Mother and Father failed to schedule the requested follow-up appointment. *Id.*

DHS social worker, Anthony Hussey, testified that he discussed Child's burns with Mother, and that Mother reported that Child was in Father's care at the time she was hurt. *Id.* at 65. Mother claimed that she did not take Child back for follow-up care because she was working, and because Father "may have been working." *Id.* at 65-66. Mr. Hussey investigated the parents' home, and explained, "I did check the water faucets and the knobs were on backwards and they did reside in a basement apartment and the water heat was extremely hot and hot enough to burn or boil eggs." *Id.* at 75.

Mr. Hussey further testified that Mother seemed to be in denial, and could not believe that Father would hurt Child. *Id.* at 72. "Mother just appeared to be in line with [F]ather and wanted [F]ather to participate with more DHS stuff, . . . . She wanted him to be part of the overall case." *Id.* Mr. Hussey later indicated that he was not sure if Mother was in denial, or if she did not appreciate the seriousness of the injuries sustained by Child. *Id.* at 76. Mr. Hussey believed that Mother and Father continued their relationship after Child was injured, because Mother would get rides with Father to Child's medical appointments. *Id.* at 71-72, 78.

Community Umbrella Agency case manager, Christoria Releford, testified that Father currently is incarcerated at Philadelphia Industrial Correctional Center. *Id.* at 98. Ms. Releford believed that Mother and Father remain in communication, and it was reported to Ms. Releford that

Mother continues to visit Father while he is incarcerated. *Id.* at 99-100. Ms. Releford expressed concern that Mother "is not able to explain why the injuries occurred, and neither is she was [sic] to identify who caused the injuries as well as [M]other doesn't seem to grasp or to accept whether [F]ather caused injuries or not." *Id.* at 100. Ms. Releford noted that Mother has been very cooperative, and was in full compliance with the programs that she had been involved with. *Id.* at 102-03.

Accordingly, the record supports the conclusion of the trial court that Child "is without proper parental care or control . . . ." 42 Pa.C.S.A. § 6302. Child suffered severe abuse at the hands of Father, and it is possible that Mother also participated in the abuse. At the very least, Mother should have known that Child was being abused, as Dr. Joseph testified that Child's rib fractures would have caused her to be in noticeable pain, even with normal handling. *See* N.T., 3/17/2015, at 49. Mother did nothing to stop Father from abusing Child, or to ensure that Child received appropriate medical care. Moreover, Mother has a history of failing to provide appropriate medical care for Child, as evidenced by her failure to seek follow-up treatment for Child's second degree burns, and by her failure to schedule an appointment to test Child for a possible genetic syndrome. Finally, Mother has continued to associate with Father. No relief is due.

Mother's second issue is that the trial court erred or abused its discretion by concluding that she committed "child abuse," as the record

indicates that Child's injuries were inflicted by Father, and Mother had no reason to know that abuse was taking place. Mother's brief at 16-18.

The applicable version of the CPSL defines "child abuse" as follows, in relevant part.

> (i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.
>
> * * *
>
> (iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.
>
> (iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

23 Pa.C.S.A. § 6303(b).[6]

The existence of "child abuse" pursuant to Section 6303(b) must be proven by clear and convincing evidence. **In re L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015). However, under certain circumstances, the identity of an abuser may be established by only *prima facie* evidence. **Id.**

---

[6] Section 6303 was amended, effective December 31, 2014, and now includes a revised definition of "child abuse." **See** 23 Pa.C.S.A. § 6303(b.1). Because Child's injuries occurred prior to the effective date of the amendment, we apply the previous version of Section 6303.

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*Id.* at 1185 (footnote omitted).

Here, the trial court found that Child had suffered abuse at the hands of Mother, because Child suffered injuries while in the care of Mother and Father, and because Child's injuries would not have occurred except for the acts or omissions of Mother and Father. Trial Court Opinion, 6/9/2015, at 3-4 (unpaginated).

We discern no abuse of discretion. As discussed *supra*, Child suffered numerous severe injuries which would not ordinarily be sustained but for the acts or omissions of Mother and Father. While Child reportedly was in the care of Father when she sustained the injuries to her internal organs, some of Child's rib fractures occurred between ten and fourteen days prior to Child's hospitalization. There was no evidence presented by Mother, or by anyone else, which demonstrated that Child was in the care of Father, rather than Mother, at the time Child's ribs were fractured. Thus, Mother has failed to rebut the presumption that her actions, or failure to act, caused those

- 11 -

injuries. Additionally, even if Mother did not intentionally harm Child, it is clear that she failed to stop Father's abuse of Child, and failed to seek medical treatment for Child's fractured ribs. Mother's omissions endangered Child's life, impaired Child's functioning, and created an imminent risk of serious physical injury to Child. **See** 23 Pa.C.S.A. § 6303(b)(iii)-(iv). The record supports the conclusion of the trial court that Mother committed "child abuse" pursuant to Section 6303(b).

Mother's third issue is that the trial court erred and/or abused its discretion by finding aggravated circumstances as to Mother. Mother's brief at 18-19. Mother repeats her previous arguments that Child was abused by Father, and that she was not aware of the injuries inflicted by Father prior to October 19, 2014. **Id.**

The Juvenile Act defines aggravated circumstances as follows, in relevant part.

> **"Aggravated circumstances."** Any of the following circumstances:
>
> ***
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302. The Juvenile Act defines "aggravated physical neglect" as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." **Id.**

In this case, the trial court found that the evidence presented during the dependency hearing "supported the finding of aggravated circumstances based on the finding of child abuse alone and additionally on the mother's lack of her protective capacity regarding the child." Trial Court Opinion, 6/9/2015, at 4 (unpaginated). Additionally, the court observed that it "'need not find the existence of aggravated circumstances as to a particular party; rather it merely must determine whether they are present in the case[.]'" *Id.* (quoting *In re R.P.*, 957 A.2d 1205, 1219 (Pa. Super. 2009)). We agree.

As explained by the trial court, this Court has held that a finding of aggravated circumstances applies to the case as a whole, rather than the parents individually. *See R.P.*, 957 A.2d at 1219 ("This is so, . . . because the focus is not on the rights of the [p]arents; instead, the children's safety, permanence, and well-being take precedence.") (citation omitted). Here, it is undisputed that Father inflicted serious bodily injuries on Child. This by itself is sufficient to support a finding of aggravated circumstances. Moreover, the record reveals that Mother engaged in aggravated physical neglect of Child, by failing to protect Child from Father, and by failing to seek medical treatment for Child's fractured ribs. No relief is due.

Mother's fourth issue is that the trial court erred and/or abused its discretion by finding that DHS need not make reasonable efforts to reunify Child with Mother. Mother's brief at 19-20. Mother again suggests that she

has provided appropriate care for Child, that she did not abuse Child, that she had no reason to suspect that Child was being abused by Father, and that she participated in services soon after discovering the abuse. *Id.*

Pursuant to the Juvenile Act, if a court finds that aggravated circumstances exist in a given case, the court must then "determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made . . . ." 42 Pa.C.S.A. § 6341(c.1). A court may end reasonable efforts at its discretion. *See In re A.H.*, 763 A.3d 873, 878 (Pa. Super. 2000).

Instantly, the trial court explained that the "totality of the circumstances in the instant case supports the cessation of reunification services." Trial Court Opinion, 6/9/2015, at 5 (unpaginated). Again, we agree.

Child was subjected to severe physical abuse. Even if Mother did not personally participate in this abuse, she failed to protect Child from Father, and failed to seek medical treatment for Child's rib injuries. Mother has demonstrated an inability or unwillingness to provide Child with appropriate medical care, as evidenced by her failure to seek follow-up treatment for Child's second degree burns, and by her failure to schedule an appointment to test Child for a possible genetic syndrome. Moreover, Mother has continued to associate with Father. Given these circumstances, the court

- 14 -

was within its discretion when it ordered that reunification services need not be made. Mother is not entitled to relief.

Finally, Mother's fifth issue is that the trial court erred and/or abused its discretion by suspending her visits and contact with Child. Mother's brief at 20-21. Mother emphasizes that Child's permanency goal remains reunification, and contends that the trial court was not permitted to end her visits with Child absent a finding that Mother poses a grave threat of harm to Child. *Id.*

It is well-settled that,

> [i]n dependency cases such as this, the standard against which visitation is measured also depends upon the goal mandated in the family service plan. Where, as here, reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a **grave threat**. If, however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children. The "best interests" standard, in this context, is less protective of parents' visitation rights than the "**grave threat**" standard.

*In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999) (citations and footnote omitted).

> The "grave threat" standard is met when the evidence clearly shows that a parent is unfit to associate with his or her children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

***In re C.B.***, 861 A.2d 287, 294 (Pa. Super. 2004), *appeal denied*, 871 A.2d 187 (Pa. 2005) (citations and some quotation marks omitted).[7]

For the reasons discussed throughout this memorandum, it is clear that Mother poses a grave threat of harm to Child. Even assuming that it was Father who directly caused Child's injuries, Mother knew, or should have known, that Child was being abused. However, Mother did nothing to help or protect Child until Father nearly killed her on October 19, 2014. Mother then continued her relationship with Father, even after Father admitted to hitting Child. Once again, we conclude that no relief is due.[8]

Accordingly, because we conclude that none of Mother's claims entitles her to relief, we affirm the orders of the trial court.

Orders affirmed.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>10/2/2015</u>

_____

[7] In its brief, DHS agrees that Child's permanency goal remains reunification, and that the grave threat standard applies. DHS's brief at 22-23.

[8] We note that Child's guardian *ad litem* filed a brief in this matter, in which he argues that the trial court's orders should be affirmed.