J-S67001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.P., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.V., FATHER | : : : : : : : | No. 1815 EDA 2018 |

Appeal from the Order Entered May 17, 2018
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0003412-2017

BEFORE:   OTT, J., NICHOLS, J., and STRASSBURGER*, J.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 19, 2018**

J.V. ("Father") appeals from the order entered on May 17, 2018, in the Court of Common Pleas of Philadelphia County, finding that the dependent male child, M.P. ("Child"), was the victim of "child abuse" and that Father was the perpetrator under the Child Protective Services Law ("CPSL").[1]  Further, the order found "aggravated circumstances" as to Father under the Juvenile Act.[2, 3]  Upon careful review, we affirm.

---

* Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 6301-6386.

[2] 42 Pa.C.S. §§ 6301-6375.

[3] The record reveals that Father is not Child's biological father, but his legal father.  N.T., 5/17/18, at 45.  The Philadelphia Department of Human Services ("DHS") has not identified Child's biological father.  *Id.*

We summarize the relevant facts and procedural history as follows. DHS became involved with this family five days after Child's birth in August of 2017, upon allegations that P.P. ("Mother") tested positive for benzodiazepines at the time of his birth, and that Child tested positive for methadone. Trial Court Opinion, 8/3/18, at 1. As a result of his exposure to methadone, Child was born with neonatal abstinence syndrome. N.T., 5/17/18, at 8. Child was discharged from the hospital to Father's care on September 27, 2017. Trial Court Opinion, 8/3/18, at 1.

On December 23, 2017, when Child was approximately four months old, DHS received a report alleging that Child was transported to St. Christopher's Hospital ("Children's Hospital") due to seizure-like symptoms. *Id.* The trial court explained:

> [U]pon examination, Children's Hospital staff found a small, left subconjunctival hemorrhage; a computed tomography ("CT") scan was performed, which revealed a front parietal subdural hematoma about nine millimeters in length; Father stated that three to four days prior to Child's hospitalization, Child had been straining to move his bowels and Father believed that strain caused Child's eye hemorrhage; Father did not provide an explanation for the CT scan findings; Children's Hospital staff did not find Father's explanation for Child's eye hemorrhage credible. . . . On December 26, 2017, DHS visited Father's home. Father denied any abuse of Child and stated that Child had seizure-like symptoms twice before this incident, but that Child's previous seizures only lasted for 30 seconds, while Child's seizure on December 23, 2017 lasted for several minutes. Father stated that he called an ambulance. . . . Father also claimed that Child had stomach issues that stemmed from acid reflux and that Mother was only sporadically involved in Child's life due to her substance abuse issues. On December 28, 2017, Father visited Child at Children's Hospital. Father failed to follow up with the DHS worker in reference to family supports that could care for Child, as

directed.  DHS obtained an Order of Protective Custody ("OPC") for Child on December 28, 2017, while Child remained at Children's Hospital.  Children's Hospital's discharge summary for Child, dated December 28, 2017, indicates that Child's injuries were most likely the result of child abuse.  On December 29, 2017, Child was discharged from Children's Hospital and placed at Baring House.

*Id.* at 1-2.

The trial court adjudicated Child dependent on March 27, 2018.  Child's placement goal was reunification.  On May 17, 2018, the court held a combined permanency review, child abuse, and aggravated circumstances hearing.  DHS presented the testimony of Marita E. Lind, M.D., the director of the child protection program at Children's Hospital, and Cynthia Johns, the DHS caseworker.  Father, who was present and represented by counsel, did not testify on his own behalf.

By order dated and entered on May 17, 2018, the trial court found that Child was the victim of "child abuse" pursuant to 23 Pa.C.S. § 6303; that Father was the perpetrator; and that Father's conduct constituted aggravated circumstances pursuant to 42 Pa.C.S. § 6302(2).[4]  On June 15, 2018, Father filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The trial court filed its Rule 1925(a) opinion on August 3, 2018.

---

[4] In addition, the trial court issued a permanency review order, which required Father to participate in (1) a drug screen and assessment at the Clinical Evaluation Unit and (2) parenting classes at the Achieving Reunification Center, *inter alia*.  Father did not appeal from the permanency order.

- 3 -

Father raises the following issues for our review:

1. Did the trial court commit an error of law and abuse of discretion by finding child abuse as to [Child] where DHS failed to prove by clear and convincing evidence that [C]hild was abused, as defined by 23 Pa.C.S. § 6303[?]

2. Did the trial [court] commit an error of law and abuse of discretion imputing child abuse as to [Father] where DHS failed to prove by clear and convincing evidence that [Father] acted intentionally, knowingly, or recklessly, or that he caused any harm or risk of harm to [C]hild, as required by 23 Pa.C.S. § 6303 or that the record did not contain sufficient rebuttal evidence to overcome the evidentiary presumption of 23 Pa.C.S. § 6381(d)?

3. Did the trial court commit an error of law and abuse of discretion by finding the existence of aggravated circumstances where DHS failed to prove by clear and convincing evidence that [Child] was the victim of physical abuse resulting in serious bodily injury caused by [Father], as required by 42 Pa.C.S. § 6302?

Father's brief at 6-7.

We review Father's appeal for an abuse of discretion. *See In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). The standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *Id.* (citation omitted).

Our Supreme Court has explained that, "a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations. . . ." *In re L.Z.*, *supra*. This Court has stated that "clear and convincing evidence" requires:

that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In the Interest of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

In his first issue, Father argues that DHS failed to prove by clear and convincing evidence that Child was a victim of "child abuse." Father asserts that Dr. Lind's testimony was inconclusive insofar as she testified that Child's injuries could have been caused by accidental trauma. In addition, he asserts that Dr. Lind, in analyzing the subject injuries, did not review Child's prior CT scan taken after Mother dropped him on the floor in the hospital prior to his discharge after birth. Further, Father argues that Child suffered head trauma in foster care soon after sustaining the subject injuries and prior to the completion of the medical assessment of those injuries. Thus, Father asserts, "The assessment of [C]hild was not properly concluded and the medical team was therefore not able to conclusively rule out other possible medical conditions or complicating factors that may have caused or contributed to [C]hild's injuries." Father's brief at 19. Father's arguments are without merit.

Section 6303 of the CPSL defines "child abuse" as follows, in relevant part.

**§ 6303. Definitions.**

- 5 -

. . .

**(b.1)** *Child abuse.* — The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

**(1)** Causing bodily injury to a child through any recent act or failure to act.

. . .

**(5)** Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

. . .

23 Pa.C.S. § 6303(b.1)(1), (5).   In addition, Section 6303 defines "bodily injury" as "[i]mpairment of physical condition or substantial pain."  23 Pa.C.S. § 6303(a).

The trial court found by clear and convincing evidence that Child was the victim of "child abuse" pursuant to Section 6303(b.1)(1) and (5).

It was established from the testimony of Dr. Marita Lind of Children's Hospital . . . that Child's hospitalization [i]n December 2017 was due to non-accidental trauma.  When Child was admitted to Children's Hospital on December 23, 2017, Child presented with stiffening movements after being fed, seizure-like activity, [a] subconjunctival hemorrhage, subdural hemorrhages, retinal hemorrhages, and [a] vitreous hemorrhage.  Child was evaluated by multiple teams at Children's Hospital, including [Dr. Lind], the trauma department, the neurosurgery department, the neurology department, the ophthalmology department, and the hematology department.  Hemorrhages were found in four different locations on Child.  Subconjunctival hemorrhage was visible through exam of Child, which presents as an area of bleeding into the white of the eye.  Vitreous hemorrhage, bleeding to the gel of the eyeball, was also found on Child.  Retinal hemorrhages were found on Child, which indicate bleeding in the back of the eye near the retina.  Child also presented with a bilateral hematoma hemorrhage in the subdural space of the skull. Child appeared with both acute and subacute hemorrhages,

meaning Child had hemorrhaging that occurred within a few days of Child's hospitalization and hemorrhaging that was older.[5]

[Dr. Lind] determined that these injuries were not related to any potential birth trauma of Child or other health conditions, including metabolic or blood disorders. Child's injuries could not have been caused [by] any type of stress or strain, includ[ing] constipation, as alleged by Father. Child's injuries were likely not caused by a drop or a fall because of the presence of old and new blood and none of these injuries could be caused by any type of infection. Additionally, [Dr. Lind] determined that the non-accidental trauma of the subconjunctival hemorrhage is most consistent with blunt force to the area near Child's eye[. Dr. Lind further determined that the subdural hemorrhages and] the retinal hemorrhages [are] most consistent with a velocity where Child's head is being moved around violently.[6] [Dr. Lind] was unable to determine if these injuries occurred in one event or on multiple occasions.

When Father brought Child to Children's Hospital, Father was unable to provide any information as to why Child was experiencing these symptoms and could not indicate if any accidental trauma occurred. [Dr. Lind] indicated that with the absence of a history of trauma reported by a parent and when a child's findings indicate trauma, there is a concern that the parent is either unaware because they were not caring for the child or that the parent is not providing a true history.

When DHS investigated the . . . report, Father informed the DHS social worker that he was responsible for the caring of Child and

_____

[5] Specifically, Dr. Lind testified, "there was old and new subdural blood." N.T., 5/17/18, at 23. With respect to the subconjunctival hemorrhage, she testified that it indicated that trauma occurred to that area within a week before Child was admitted to Children's Hospital. *Id.* at 36. In addition, Dr. Lind testified that retinal hemorrhages "sometimes can take two to three weeks to resolve." *Id.*

[6] Dr. Lind explained that, "when a child's head is moved violently and there is a difference in the speed between the movement of the brain and the movement of the skull, there's . . . shearing forces that are applied to both the brain tissue, and also to the vessels." N.T., 5/17/18, at 24-25. Dr. Lind agreed on cross-examination by the Child Advocate that Child could not move his head that violently by himself. *Id.* at 25.

is the only caregiver that lives in the home. Father was also unable to identify any type of traumatic accidents that Child was involved in prior to Child's hospitalization. Child's injuries were the result of non-accidental trauma because Child could not contribute to the events on his own nor was the trauma the result from any accident . . . while under Father's care.

Trial Court Opinion, 8/3/18, at 4-5 (citations to record omitted) (footnotes omitted) (paragraph breaks inserted); *see also* N.T., 5/17/18, at 18. The testimony of Dr. Lind and the DHS caseworker, Ms. Johns, supports the court's findings.

Dr. Lind testified on redirect examination:

Q. [Y]ou were asked on cross-examination about whether [F]ather had presented any inconsistent information, or simply the information that he did not know what happened.

What concern, if any, would you have from the child protection standpoint in regards to a four-month-old presenting with concerns for multiple episodes of non-accidental trauma and a parent that doesn't know what happened?

A. So, a child who was four months of age requires constant care and supervision. So, it would be expected that, if the child had experienced accidental trauma, say, a fall, being dropped, being in a car accident that the caretaker would know about accidental trauma.

So, the absence of a history of any trauma in a child that has findings that we've determined are most consistent with trauma, it raises a concern that either the parent is unaware because they weren't the caretaker at the time or that they're not providing a true history.

N.T., 5/17/18, at 41.

Contrary to Father's assertion that Dr. Lind's testimony was inconclusive, Dr. Lind testified, "all of the [physicians] involved in [Child's]

hospitalization in December [of 2017] identified non-accidental trauma as most consistent with the child's findings." *Id.* at 21. She stated:

> [I]n this child, there was a concern that [his injuries] might [be caused] by seizure activity. . . . That's why neurology was involved, and that's why an EEG was done.
>
> There was no identified seizure activity. There was a concern of trauma because of the subconjunctival hemorrhages. The evaluation of that . . . found further signs of trauma.
>
> There was a concern about bleeding problems because the child had hemorrhage, and that's why hematology was consulted. There wasn't any bleeding disorder identified.

*Id.* at 17. Dr. Lind opined, "In the absence of a history of significant accidental trauma, these findings are most consistent with child physical abuse, non-accidental trauma." *Id.* at 22. Further, she opined, "the finding of bleeding at different ages is most consistent with trauma on multiple occasions." *Id.* at 19.

In addition, the record belies Father's assertion that Dr. Lind did not review Child's prior CT scan in examining the subject injuries. Dr. Lind explained that Mother had dropped Child in the hospital after birth, and that the hospital performed a CT scan. *Id.* at 11. Dr. Lind testified that she "obtained the record of the CAT scan,"[7] which revealed no hemorrhaging. *Id.* Dr. Lind testified as follows on direct examination by DHS's counsel.

---

[7] CAT is the abbreviation for computerized axial tomography, and such scans are the same as CT scans, identified by the trial court above as computed tomography scans. Therefore, in the testimonial evidence, CAT scans and CT scans were used interchangeably.

Q. And did you have any concerns with respect to the reading of that CAT scan as normal . . .?

A. No.

Q. Could any of these hemorrhages have been related to birth trauma in any way for this child?

A. Similar injuries could be related to birth trauma, but these particular injuries, presenting at four months of age, were not related to birth trauma.

Q. How do you know that?

A. Well, because if the child had had the subconjunctival hemorrhage at birth, it would have resolved by four months of age, and if the subdural [hematomas] had been present at birth, they would have been identified on the CAT scan, and they also would have resolved by this time. They wouldn't have been acute.

*Id.* at 11-12.

Finally, Dr. Lind testified that she scheduled a follow-up appointment for Child, which is standard procedure, prior to completing her medical assessment and issuing a final report. *Id.* at 32. She testified that Child did not attend the scheduled follow-up appointment because, in the middle of January of 2018, Child "sustained a fall off a bed in foster care and had a skull fracture." *Id.* As a result, Child was re-admitted to Children's Hospital. On cross-examination by Father's counsel, Dr. Lind testified as follows:

Q. [I]s it fair to say that from the time you initially evaluated [Child] and the time that he was readmitted, that you weren't able to complete your assessment the way you normally would?

A. Correct.

*Id.* at 33. Nevertheless, Dr. Lind testified that Child received a magnetic resonance imaging ("MRI") scan due to his subsequent trauma, which revealed "acute subdural blood, on top of his now subacute subdural blood, on top of chronic subdural blood. So, he had increased subdural hemorrhage." *Id.*

Based on the foregoing testimony, we reject Father's assertion that Dr. Lind's assessment was not "properly concluded." Dr. Lind did not testify that she did not complete her assessment or that she completed it improperly. Rather, she testified that she did not complete it in the way she normally would because of Child's re-admittance to the hospital. Dr. Lind's testimony contradicts Father's assertion that the medical team was unable to "conclusively rule out other possible medical conditions or complicating factors that may have caused or contributed to" Child's subject injuries. As such, Father's first issue fails.

In his second issue, Father asserts that, assuming Child was the victim of "child abuse," the record fails to support the trial court's conclusion that he was the perpetrator pursuant to Section 6381(d) of the CPSL. Father asserts that he was a responsible and appropriate caregiver to Child, and that he had no reason to suspect Child had any internal injuries until he observed the seizure-like symptoms, which prompted him to call an ambulance. Finally, Father asserts that Child's paternal grandparents lived in the home with them, although he was Child's primary caretaker. Father's claims are without merit.

The identity of the perpetrator of child abuse "need only be established through *prima facie* evidence in certain situations. . . ." ***In re L.Z.***, ***supra*** at 1174. *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." ***Id.*** at 1184 (citing Black's Law Dictionary 825 (6th ed. abridged 1991)). Section 6381(d) of the CPSL provides:

> **§ 6381. Evidence in court proceedings.**
>
> . . .
>
> **(d)** ***Prima facie evidence of abuse.*** **—** Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.
>
> . . .

23 Pa.C.S. § 6381(d). The ***L.Z.*** Court held:

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

***In re L.Z.***, ***supra*** at 1185 (footnote omitted).

Instantly, the trial court found, "there was *prima facie* evidence that Father is the perpetrator of child abuse under 23 Pa.C.S.A. § 6381(d) since Father was the primary caregiver for Child. Father was unable to rebut the presumption." Trial Court Opinion, 8/3/18, at 5-6. The record supports the court's findings.

Ms. Johns, the DHS caseworker, testified that she met with Father in his home shortly after Children's Hospital had admitted Child for the subject injuries, at which time Father told her that he and Child resided with Child's paternal grandparents. N.T., 5/17/18, at 47. Ms. Johns' testimony, in conjunction with Dr. Lind's opinion that the subject injuries were most consistent with child abuse, supports the court's finding that *prima facie* evidence existed as to Father. Ms. Johns testified on direct examination as follows.

> Q. And did you ask [Father] whether [Child] had been in any type of child care environment or daycare [near the time he was admitted to Children's Hospital]?
>
> A. Yes. He said that he's responsible for the baby, . . ., that the baby is home with him all the time.
>
>    [H]e . . . did state that other family members do come in and out of the home, but he's . . . primarily responsible for the care of the baby.
>
> Q. And did [F]ather provide you with any type of employment schedule for periods where he would not have been in the home?
>
> A. Not that night, no, and I do believe that dad informed me that he was not employed.

- 13 -

Q. And he indicated that [M]other resided [at] a different address, correct?

A. Yes. He said that mom comes to the house every once in a while, and she drops off [P]ampers.

Q. Was he able to provide you with specific time frames of how frequently she would attend the house or --

A. No.

Q. -- and was he able to provide you with any type of travel or other periods of time where he had not been the caregiver for [Child] in that household, if any?

A. Dad told me that he goes to JFK [John F. Kennedy clinic] for methadone . . . treatment. I'm not sure if it was that evening or whether it was later in my investigation that he told me that. . . .

[THE COURT]: So, did dad indicate to you, when he goes to his treatment, who does he leave the baby with?

A. I really don't recall.

. . .

Q. And did he indicate to you that . . . either his mother or his father assisted him with caring for the child?

A. I believe that he told me that his mom does help. . . .

Q. Was he able to provide you with a specific timeframe for any of that or was it more of a general –

A. No, it was just, like, a general statement.

[THE COURT]: Did he explain what he meant by grandmom helps with [Child]? What does she do as far as help. . . .

. . .

A. -- I really don't think that we went into details. . . .

*Id.* at 51-53.

Thus, Father revealed to Ms. Johns that he was Child's primary caretaker at all times. He did not reveal that Child was in the care of any other person within the weeks leading to Child's admittance to Children's Hospital for the subject injuries. In addition, Father did not reveal any accidental cause for Child's injuries. As such, Father did not rebut the presumption that he was the perpetrator of the abuse in this case.

In an attempt to rebut the presumption, however, Father cites the testimony of Ms. Johns on direct examination during which she acknowledged that Child was medically up-to-date after his initial discharge from the hospital at birth. *Id.* at 54-55. Further, Ms. Johns testified that Father told her that, "on a couple of occasions," Child "had been, like, shaking, . . ., stiffening himself up. . . ."[8] *Id.* at 51. She testified that Father told her, "this particular day, that when he was holding the baby, the baby did it again, but it lasted longer, and it scared him. So, that's why he called an ambulance for the baby." *Id.* Father also cites the following testimony by Dr. Lind on cross-examination by his counsel:

> Q. [W]ould there be any outward signs that [F]ather should have seen, and sought out treatment earlier?
>
> A. So, because I wasn't present at the time of the trauma, I don't know how the child appeared immediately after the trauma or how he acted after the trauma.

---

[8] Dr. Lind testified that, because of his neonatal abstinence syndrome, Child had "jerky movements." N.T., 5/17/18, at 37. Nevertheless, upon discharge after birth, Child "was healthy in terms of growing and showing signs of appropriate development." *Id.*

But . . . there wasn't any evidence that he'd ever experienced a hypoxic event or had suppressed breathing or consciousness to the point that he had hypoxic changes or brain swelling.

So, there's no reason to believe that he had an event that would have required someone to call an ambulance unless they had witnessed the event. As far as abnormal movements, the father did seek care for them.

I do believe that, given the child had baseline abnormal movements, it may have been difficult if he had sought medical advice, especially over the phone, for him to have been given guidance about that.

*Id.* at 37-38.

We conclude that the foregoing testimony does not contradict Dr. Lind's opinion that Child's subject injuries were not the result of an accident, but of child abuse. Indeed, the record evidence establishes that Child suffered injuries "that would not ordinarily be sustained but for the acts or omissions of" Father, and Father failed to rebut the presumption. *In re L.Z.*, *supra* at 1185. Father's second issue fails.

In his final issue, Father asserts that the evidence does not support the trial court's finding of aggravated circumstances pursuant to the Juvenile Act. Specifically, Father claims that, in finding aggravated circumstances, the court "relied wholly on the operation of the evidentiary presumption under § 6381(d) in imputing child abuse as to Father." Father's brief at 29. Because Father contends that the court erred in finding him the perpetrator under Section 6381(d), he asserts that the court also erred in finding aggravated circumstances against him.

- 16 -

The Juvenile Act provides that, if a trial court determines that a child is dependent, and aggravated circumstances have been alleged by the county agency or by the child's attorney, the court must also determine whether aggravated circumstances exist. *See* 42 Pa.C.S. § 6341(c.1). If the court determines that aggravated circumstances exist, the court must then consider whether reasonable efforts should be made to reunify the child with his or her parent or parents. *Id.* Following a finding of aggravated circumstances, a court may end reasonable efforts at its discretion.[9] *See In re L.V.*, 127 A.3d 831, 839 (Pa. Super. 2015) (citing *In re A.H.*, 763 A.2d 873, 878 (Pa. Super. 2000)).

The Juvenile Act defines "aggravated circumstances" as follows, in relevant part.

> **"Aggravated circumstances."** -- Any of the following circumstances:
>
> . . .
>
> **(2)** The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> . . .

42 Pa.C.S. § 6302. The Juvenile Act defines "serious bodily injury" as "Bodily injury which creates a substantial risk of death or which causes serious,

---

[9] In this case, the trial court set Child's placement goal as reunification.

permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." ***Id.***

In this case, the trial court reasoned as follows.

It was established from the testimony of [Dr. Lind] that Child's hospitalization [i]n December 2017 was due to non-accidental trauma. Based on clear and convincing evidence, the trial court found that Child had been the victim of child abuse resulting in serious bodily injuries that could not be explained by Father, the primary care parent. Child suffered bodily injuries that created substantial risk of death and impairment of the function of bodily organs. Hemorrhages were found in four different locations on Child. Subconjunctival hemorrhage is visible through exam of Child, which present as an area of bleeding into the white of the eye. Vitreous hemorrhage, bleeding to the gel of the eyeball[,] was also found on Child. Retinal hemorrhages were found on Child, which indicate bleeding in the back of the eye near the retina. Child also presented with a bilateral hematoma hemorrhage in the subdural space of the skull. Child appeared with both acute and subacute hemorrhages, meaning Child had hemorrhaging that occurred within a few days of Child's hospitalization and hemorrhaging that was older. [Dr. Lind] determined that these injuries were not related to any potential birth trauma of Child or other health conditions, including metabolic or blood disorders. Child's injuries could not have been caused [by] any type of stress or strain, includ[ing] constipation, as alleged by Father. Child's injuries were likely not caused by a drop or a fall because of the presence of old and new blood and none of these injuries could be caused by any type of infection. Additionally, [Dr. Lind] determined that the non-accidental trauma of the subconjunctival hemorrhage is most consistent with blunt force to the area near Child's eye and the retinal hemorrhages is most consistent with a velocity where Child's head is being moved around violently. [Dr. Lind] testified that any type of trauma to eyes would be painful. The severity of the pain of a newborn is hard to express due to the baby's inability to talk. Father was responsible for caring for Child. . . .

Trial Court Opinion, 8/3/18, at 6-7 (citations to record omitted).  As such, the trial court concluded that aggravating circumstances existed as to Father under 42 Pa.C.S. § 6302.

The testimonial evidence discussed above establishes that Child was the victim of physical abuse resulting in serious bodily injury insofar as he suffered impairment of the function of his eyes and head.  Indeed, Dr. Lind testified on cross-examination by the Child Advocate that a subdural hematoma, which she explained is bleeding in the space around the brain, has the potential to be life-threatening because it "is occupying space, and putting pressure on the brain can be life-threatening. . . ."[10]  N.T., 5/17/18, at 24.  Moreover, on inquiry by the trial court, Dr. Lind testified that Child's subdural hemorrhages would have caused Child the same pain as that caused by a concussion.  *Id.* at 40.  Father's final issue fails.  Because we discern no abuse of discretion by the trial court, we affirm the order.[11]

Order affirmed.

---

[10] Dr. Lind clarified that Child's bilateral subdural hematomas were not life-threatening in this case.  N.T., 5/17/18, at 24.

[11] The Child Advocate filed a brief in this appeal in support of the subject order.

- 19 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/19/18