J-S28001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.V., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.D., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 309 MDA 2020 |

Appeal from the Dispositional Order Entered January 15, 2020
In the Court of Common Pleas of Lycoming County Juvenile Division at
No(s):  CP-41-DP-0000001-2020

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED AUGUST 14, 2020**

A.D. ("Mother") appeals the order of adjudication and disposition entered on January 15, 2020, which finds, *inter alia*, that she perpetrated child abuse against her infant son, J.V.[1]   We affirm.

J.V. was born in October 2019.   The juvenile court summarized the procedural and factual history that began approximately two months later:

> On the morning of December 4, 2019, at approximately 7:52 a.m., Mother contacted 911 and reported that [J.V.] was unresponsive.  [J.V.] was first rushed to Jersey Shore Hospital, and then taken to Geisinger Medical Center by life flight and there admitted to the pediatric intensive care unit ("PICU").  [J.V.]'s treating physician made initial findings of retinal hemorrhage and brain swelling [rib fractures] and expressed concern that the injuries appeared to result from non-accidental trauma.  Mother and [Father] were subject to questioning by both police and a Lycoming County Child and Youth Services ("CYS") caseworker on the evening of December 4.  Thereafter, on January 2, 2020, [J.V.]

---

[1] The juvenile court also found that T.V., the father of J.V., perpetrated child abuse.  N.T., 1/15/20, at 47-48.  Father did not appeal.

was transferred from the PICU to the children's unit, where his supervision by medical staff decreased, allowing his parents to regain direct care and access.

On January 3, 2020, . . . CYS commenced the instant action by filing . . . a petition seeking that [J.V.] be placed in protective custody at Geisinger Medical Center, as the parents were subject to ongoing criminal and Child Protective Services ("CPS") investigations. On the same date, the court granted an order for emergency protective custody, pending a full hearing. Following an evidentiary hearing held January 6, 2020, the court issued a recommendation for shelter care, finding it in the interest of the welfare of the child. The court granted CYS legal and physical custody of [J.V.], with contact by the parents limited to supervised visits.

A dependency hearing was thereafter held on January 15, 2020, at which the court considered CYS's dependency petition alleging that [J.V.] was a victim of child abuse as defined at 23 Pa.C.S. § 6303, and CYS's motion for finding of aggravated circumstances. Following the dependency hearing, at which both parents were present and represented by counsel, the court issued an order of adjudication and disposition entering a finding of abuse and holding that [J.V.] was a dependent child. The court additionally made an aggravated circumstances finding under 42 Pa.C.S. § 6302, determining that [J.V.] had been a victim of physical abuse resulting in serious bodily injury, sexual violence, and/or aggravated neglect perpetrated by both parents.

Juvenile Court Opinion, 3/10/20, at 2-3 (footnotes and unnecessary capitalization omitted).

On February 14, 2020, Mother filed a timely notice of appeal from the adjudication and disposition and a concise statement of errors complained of

on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[2]  She presents three

issues for our review:

> 1.  Whether the [juvenile] court erred in making a finding of abuse
> as defined at 23 Pa.C.S. § 6303 against [Mother] as there is no
> evidence Mother harmed the child[?]
>
> 2.  Whether the [juvenile] court erred in making a finding of abuse
> as defined at 23 Pa.C.S. § 6303 against [Mother] as there was no
> evidence [Mother] observed or was aware of any harm being done
> to the child[?]
>
> 3.  Whether the [juvenile] court erred in granting the Agency's
> motion for a finding of aggravated circumstances as it pertains to
> [Mother] as there is no evidence [Mother] abused the child[?]

---

[2] Although Mother conflates the two orders in the argument section of her brief, Mother did not appeal the finding of aggravated circumstances, which is a collateral order appealable as of right.  **See In re R.C.**, 945 A.2d 182, 184 (Pa.Super. 2008).  Thus, that order is not before us.  **See e.g.**, **Interest of M.H.**, 1286 EDA 2019, 2019 WL 6716291, at *2 (Pa.Super. 2019) (observing, "Mother did not appeal the aggravated circumstances order, but timely filed the instant appeal regarding the adjudication and dispositional order.");  Pa.R.A.P. 126(b)(2) ("Non-precedential decisions [filed after May 1, 2019] may be cited for their persuasive value").

To the extent that we would confront the merits of the order finding aggravated circumstances against Mother, we would affirm it for the reasons cogently explained by the juvenile court,

> The [c]ourt may find aggravated circumstances when "the child or
> another child of the parent has been the victim of physical abuse
> resulting in serious bodily injury, sexual violence or aggravated
> physical neglect by the parent."  The severity of [J.V.]'s injury and
> the likelihood that those injuries will be permanent justified a
> finding of physical abuse resulting in serious bodily injury and the
> entry of the Aggravated Circumstances Order.

Juvenile Court Opinion, 3/10/20, at 7 (footnotes omitted).

Mother's brief at 7.[3]

We review the juvenile court's determination of abuse for an abuse of discretion. *In the Interest of J.M.*, 166 A.3d 408 (Pa.Super. 2017). As the alleged abuse occurred in December 2019, the current version of the Child Protective Service Law ("CPSL"), which became effective on June 12, 2018, controls our review. The statute defines child abuse, in relevant part, as follows:

> **(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly[4] doing any of the following:

_____

[3] J.V.'s guardian *ad litem*, Angela Lovecchio, Esquire, mailed a letter to this Court stating that she did not intend to file a brief.

[4] The CPSL refers to 18 Pa.C.S. § 302 with respect to the definitions of intentionally, knowingly, and recklessly. 18 Pa.C.S. § 302(b) provides as follows:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(1) Causing bodily injury to a child through any recent act or failure to act.

. . . .

(8) Engaging in any of the following recent acts:

. . . .

(iii) Forcefully shaking a child under one year of age.

. . . .

23 Pa.C.S. § 6303(b.1) (footnote omitted). Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

In ***In the Interest of J.R.W.***, 631 A.2d 1019, 1024 (Pa.Super. 1993), we explained that, pursuant to the doctrine of incorporation, the Juvenile Act's definition of dependent child subsumed the definition of child abuse outlined

_____

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

in the CPSL. Thus, we stated the two laws "must be applied together in the resolution of child abuse complaints." *Id*. at 1023. We reasoned,

> The Legislature intended a detailed and specific definition of abuse to leave no doubt as to the capacity of the trial court, which in this case can only be the Juvenile Court, to make a finding and determination that a child has been abused. In its capacity as a trial judge, the Juvenile Court judge will look and must look to the above definition of child abuse in a case referred by the child protective service agency to the Court under petition for review of dependency when child abuse has been alleged.

*Id*.

In addition to establishing the pertinent definition of child abuse, the court in *J.R.W.* also stressed that the juvenile court's determination of whether child abuse occurred must be supported by clear and convincing evidence. *Id*.

> [T]he clear and convincing evidence necessary to find dependency, [sic] has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases. . . . There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse.

*Id*.; *see also In re L.Z.*, *supra* at 1174.

Moreover, 23 Pa.C.S. § 6381 provides, in part:

> **(d) Prima facie evidence of abuse.--**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381.

Mother argues that the juvenile court erred finding Mother a perpetrator of abuse because CYS did not present evidence that she abused J.V., or that she observed or was aware of any abuse of J.V. Mother's brief at 16-18. Mother asserts that the juvenile court's determinations as to abuse were incorrectly based on both Mother and Father caring for J.V. at the relevant time, neither admitting responsibility for J.V.'s injuries, the extremely small nature of Mother's and Father's residence, and Father yelling to rouse J.V. **Id**. at 16. Mother instead maintains that she stated that she was sleeping and that Father stated that he was caring for J.V. at the relevant time. **Id**. at 16. Mother continues with her argument suggesting that Father further stated that he shook J.V. in an effort to wake him and that there is no evidence that she was aware of these actions. **Id**. at 16-17. Distinguishing the instant matter from **In re L.V.**, 209 A.3d 399 (Pa.Super. 2019), where the mother noticed physical injury to the child and awaited an upcoming medical appointment, Mother states, "The testimony appears to point to someone else having caused the injuries other than [Mother] and there is no testimony which shows she caused or knew of the injuries and then failed to provide medical care." **Id**. at 17.

In finding J.V. was the victim of child abuse, the juvenile court reasoned:

> The [CPSL] defines "child abuse," in relevant part, as follows: "Causing bodily injury to a child through any recent act or failure to act. . . . Forcefully shaking a child under one year of age." While the existence of child abuse must be proven by clear and convincing evidence, in certain circumstances the identity of the abuser may be established by *prima facie* evidence:

- 7 -

[E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the prima facie evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

[*In re L.V.*, 127 A.3d 831, 837-38 (Pa.Super. 2015)]

This presumption is specifically applicable when multiple potentially responsible caregivers are involved, as those caregivers will often "circle the wagons" or alternatively point fingers at each other. Due to the pendency of criminal charges, both parents declined to testify at the Dependency Hearing, and consequently offered no evidence rebutting this presumption.

Therefore, the [c]ourt found that [J.V.] had suffered abuse at the hands of Mother, because [J.V.] suffered injuries while in the care of Mother and Father, and because [J.V.]'s injuries would not have occurred except for the acts or omissions of Mother and Father. Dr. Bruno's testimony regarding the likely cause of [J.V.]'s constellation of injuries established by clear and convincing evidence that [J.V.]'s injuries were not accidental, but instead the result of abuse. These injuries include rib fractures, retinal bleeding, bleeding and swelling in the subdural and subarachnoid hemispheres of the brain, ventricle bleeding, and a loss of differentiation between white and gray matter cells within the brain, resulting in potentially irreversible brain damage. Additionally, it is undisputed that Mother and Father were the sole caregivers during the period when the abuse occurred. Ms. Spagnuolo's summation of Mother and Father's separate reports regarding the night of December 4 indicates that either parent would have had opportunity to commit the abuse. As neither parent offered rebuttal testimony, the [c]ourt finds that CYS

established a *prima facie* case that Mother and Father were the perpetrators of abuse.

Juvenile Court Opinion, 3/10/20, at 6-7 (footnotes omitted).

The certified record supports the juvenile court's finding of abuse as perpetrated by Mother. **See** 23 Pa.C.S. § 6303(b.1); 23 Pa.C.S. § 6381. The record reveals that J.V. suffered significant physical injury while in the exclusive care of Mother and Father. Critically, Pat Bruno, M.D., a member of the pediatric child abuse team at Geisinger Medical Center, testified that J.V. presented subsequent to cardiac arrest and suffered bilateral retinal and subjunctival bleeding and bruising, swelling, bleeding, pressure on the brain, as well as swelling to the neck, and fractures to the first rib. N.T., 1/15/20, at 8-10, 14; Exhibit 1. Specifically, J.V. experienced bleeding between the layer of tissue surrounding the brain and the inner layer of the brain, as well as intraventricular bleeding in the brain. *Id*. at 9. Additionally, the swelling was so extensive that the back portion of J.V.'s brain was herniating through an opening in the back of the skull, the foramen magnum, and there was also a loss of differentiation of the white and grey matter in the brain. *Id*. at 9-10.

Moreover, Dr. Pat Bruno, opined that the foregoing injuries were not-accidental in nature. *Id*. at 13-14, 19; *see also* N.T., 1/15/20, Exhibit 1. The following exchange occurred at the dependency hearing,

> Q. Okay. Now, Doctor, I'm gonna ask you if you have an opinion whether or not the injuries you just testified to regarding [J.V.], whether they were accidental or non-accidental in nature?
>
> A. They were non-accidental in nature.

Q. And can you tell us why you have that opinion, what your basis is?

A. My basis is the constellation of findings with this child, the fracture of the ribs, the access of – multiple areas of bleeding in the brain, the subarachnoid, the subdural, the swelling of the brain, the bleed into his ventricles, the damage to his brain, the gray matter/white matter issue that I discussed with you.

The constellation of injuries in a child that was, otherwise, relatively healthy, did have some feeding issues but otherwise relatively healthy prior to this, this constellation of injuries can be explained by non-accidental trauma.

*Id*. at 13-14. Dr. Bruno noted that the injuries were acute and would have caused immediate signs and symptoms. *Id*. at 10-11, 17. He further explained, "Those injuries would have occurred . . . immediately prior to one or both of the parents noting th[e] change in the child's behavior." *Id*. at 18-19. In turn, Dr. Bruno further opined that the injuries suffered by J.V. constituted physical abuse. *Id*. at 14.

Further, as to the extent of the injury to J.V., the records from Geisinger Medical Center note a "severe, un-survivable injury" without indication for neurosurgical intervention. N.T., 1/15/20, Exhibit 1. Dr. Bruno testified that J.V. was no longer exhibiting higher cerebral functioning, and that such cerebral injury was likely irreversible. On direct examination, Dr. Bruno stated:

There's very little motion. [J.V.] does have some movement of his arms and legs; but they said that the reflexes he has are very primitive, brain-stem-type of reflexes. . . .

And so the indication was that they were concerned that there weren't any areas of higher functioning, cerebral-type functioning going on. They indicated that what they saw with him

as far as activity, he's got . . . a gag reflex; and he has spontaneous respirations. But they indicated that these were probably brainstem functions that we were seeing.

He did have an EEG. He has had quite a few EEG's, and at least one of them has indicated that here was very little electrical activity as far as the cerebrum was concerned. So, you know he suffered, you know, a devastating anoxic injury and probably most of these injuries, at least in the cerebral area, are not gonna be reversible. It's hard to say, you know, for sure. But that's what the neurologists are saying, that some of this change is gonna be irreversible.

*Id.* at 13.

Elizabeth Spagnuolo, a caseworker in the CYS Assessment Unit, testified that both Mother and Father were the sole caregivers of J.V. during the relevant period of time and neither offered any real explanation as to how J.V. became injured. *Id*. at 24-26, 29. Instead, they proffered that J.V.'s primary pediatric physician, who had been seeing J.V. approximately every three days due to a failure to gain weight, perhaps missed something. *Id*. at 26, 31-32. Moreover, their inconsistent accounts of the morning led Ms. Spagnuolo to believe that they were not being entirely honest. *Id*. at 29. She observed that, while Father reported shouting in an attempt to wake his nonresponsive son, Mother indicated that she did not hear anything unusual prior to finding the child at 7:45 a.m. *Id*. Ms. Spagnuolo further observed that, based upon the fact that the family's apartment is "quite small," both Mother and Father would have been aware of what was going on . . . or at least been able to give more information of what occurred that evening then – or that morning than what they had." *Id*. at 29-30.

As confirmed by the forgoing evidence, the certified record supports the juvenile court's finding of abuse pursuant to 23 Pa.C.S. § 6303(b.1), as perpetrated by both Mother and Father. Accordingly, we do not disturb it. Given the clear and convincing evidence adduced during the hearing, Mother's claim that she did not abuse J.V., and was not aware of any abuse, strains credulity. That medical assistance was sought quickly after the physical abuse was inflicted does not detract from the court's finding. Accordingly, we affirm the juvenile court's order of adjudication and disposition finding child abuse.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/14/2020